A.Y. McDONALD INDUSTRIES,
INC., Plaintiff,

v.

INSURANCE COMPANY of NORTH
AMERICA, The American Insurance
Company, Hartford Accident and In-
demnity Company, The Aetna Casualty
and Surety Company, American Em-
ployers Insurance Company, Employ-
ers Reinsurance Corporation, Allstate
Insurance Company, Employers Insur-
ance Company of Wausau, National
Surety Corporation, Puritan Insurance
Company, Old Republic Insurance
Company, Twin City Fire Insurance
Company, The Home Insurance Com-
pany, and The Cincinnati Insurance
Company, Defendants.

No. 89–1722.

Supreme Court of Iowa.

Sept. 18, 1991.

608

William C. Fuerste, Stephen J. Juergens, and Gregg L. Owens of Fuerste, Carew, Coyle, Juergens & Sudmeier, Dubuque, for plaintiff A.Y. McDonald Industries, Inc.

Paul R. Koepff, Kathleen A. Gallagher, and Michael P. Murphy of Mudge, Rose, Guthrie, Alexander & Ferdon, New York, New York, and Robert M. Jilek of Simmons, Perrine, Albright & Ellwood, Cedar Rapids, for defendant Ins. Co. of North America.

Daniel A. Bartoldus, Lawrence A. Levy, and Alyse Walker of Rivkin, Radler, Bayh, Hart & Kremer, Uniondale, N.Y., and Greg A. Egbers of Betty, Neuman & McMahon, Davenport, for defendants The American Ins. Co. and Nat. Sur. Corp.

Paul L. Gingras and Richard M. Hagstrom of Zelle & Larson, Minneapolis, Minnesota, and Richard P. Moore of Moyer & Bergman, Cedar Rapids, for defendant Employers Ins. of Wausau.

Daniel G. Litchfield and Gail D. Zwemke of Burditt, Bowles & Radzius, Chicago, Ill., and John M. Wharton of Peddicord & Wharton, Des Moines, and Terry J. Abernathy of Pickens, Barnes & Abernathy, Cedar Rapids, and William C. Davidson and Carole J. Anderson of Lane & Waterman, Davenport, for defendants The Aetna Cas. and Sur. Co., The Cincinnati Ins. Co., Employers Reinsurance Corp. and American Employers Ins. Co.

Susan Allender, Gen. Counsel, and Diane Munns, Deputy Gen. Counsel, for amicus curiae Iowa Utilities Bd.

Roger L. Lande, John S. Gosma, and David J. Meloy of Stanley, Rehling, Lande & Van Der Kamp, Davenport, and Peter C. Condron, Michel Y. Horton, and Paul A. Zevnik of Kaye, Scholer, Fierman, Hays & Handler, Washington, D.C., for amici curiae City of Clinton, Iowa, Iowa Southern Utilities Co., Winnebago Industries, Inc., Quantum Chemical Corp., Getty Chemical Co., Hon Industries, Inc., and Grain Processing Corp.

Mark E. Schantz of Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, and Thomas W. Brunner, Marilyn E. Kerst, and Frederick S. Ansell of Wiley, Rein & Fielding, Washington, D.C., for amici curiae Employers Mut. Cas. Co., Hawkeye–Security Ins. Co., United Sec. Ins. Co., and Ins. Environmental Litigation Ass'n.

Douglas Gross of Brown, Winick, Graves, Donnelly, Baskerville & Schoenebaum, Des Moines, for amici curiae Iowa Power, Inc., Iowa Elec. Light & Power, Interstate Power Co., Iowa–Illinois Gas &

Elec. Co., United Cities Gas Co., and Peoples Natural Gas Co.

Mark A. Critelli of Comito & Capps, West Des Moines, and John B. Haarlow, Richard E. Mueller, and Diane I. Jennings of Lord, Bissell & Brook, Chicago, Ill., for amicus curiae John Richard Ludbrook Youell (a Lloyd's of London underwriter).

Thomas J. Miller, Atty. Gen., Elizabeth M. Osenbaugh, Deputy Atty. Gen., and John P. Sarcone, Asst. Atty. Gen., for amicus curiae State of Iowa.

LAVORATO, Justice.

This case presents certified questions from the federal district court for the northern district of Iowa. *See* Iowa Code § 684A (1991); Iowa R.App.P. 451–61. The underlying action arises out of environmental contamination claims asserted by a federal governmental agency against the plaintiff A.Y. McDonald Industries, Inc. (A.Y. McDonald). A.Y. McDonald contends that because of these claims it was forced to incur, and will incur in the future, certain costs. A.Y. McDonald sought from the defendants a recovery of these costs as well as a civil penalty assessed against it. The defendants are various insurance companies that had insured A.Y. McDonald with comprehensive general liability (CGL) policies over a period of years.

After the defendants refused to defend and indemnify A.Y. McDonald, the company sued them in the Iowa district court. In this suit A.Y. McDonald sought a declaration as to the scope of coverage afforded by the CGL policies and whether the defendants had a duty to defend the company.

The case was removed to the United States District Court for the Northern District of Iowa, Eastern Division.

Each defendant had either provided CGL or umbrella and excess insurance to A.Y. McDonald at some time between May 1, 1972, and October 31, 1986.

The defendants allegedly providing CGL policies between 1975 and 1986 were:

Insurance Company of North America,

The American Insurance Company,

Hartford Accident and Indemnity Company,

The Aetna Casualty and Surety Company.

Apparently the insurers providing CGL coverage between 1972 and 1975 were unknown at the time the petition was filed. But on May 16, 1988, A.Y. McDonald amended its petition to add Employers Insurance Company of Wausau (Wausau). The amendment alleged that Wausau had provided A.Y. McDonald with CGL coverage between January 1, 1949, and January 1, 1968.

The defendants allegedly providing umbrella and excess coverage between 1972 and 1986 included:

American Employers Insurance Company,

Employers Reinsurance Corporation,

Allstate Insurance Company,

National Surety Corporation,

Puritan Insurance Company,

Old Republic Insurance Company,

Twin City Fire Insurance Company,

The Home Insurance Company,

The Cincinnati Insurance Company.

Several of the defendants filed motions for summary judgment on the coverage and duty to defend issues. The federal district court entered an order, making certain factual findings. However, the court reserved ruling on the motions pending certification of the coverage and duty to defend questions.

I. *The Facts.*

In its certification order the federal district court made the following findings of fact, which are essentially undisputed. From about 1949 to October 31, 1983, A.Y. McDonald manufactured brass valves in its brass foundry in Dubuque, Iowa. Any sand remaining after the completion of the process was dumped on the foundry site. Mixed in with the sand was a residue of brass. Lead is a component of brass residue.

On December 6, 1984, the United States Environmental Protection Agency (EPA) served A.Y. McDonald with a complaint, compliance order, and notice of opportunity for hearing. These documents were served pursuant to section 3008 of the Resource Conservation and Recovery Act of 1976 (RCRA), Pub.L. No. 94–580, 90 Stat. 2795 (now codified as amended at 42 U.S.C. § 6928 (1988)).

The matter went to hearing before an administrative law judge (ALJ) who issued an "Initial Decision" on April 24, 1986. The ALJ found that A.Y. McDonald had violated RCRA and imposed a civil penalty against the company. In addition the ALJ required A.Y. McDonald to submit a closure and postclosure plan.

A.Y. McDonald appealed this decision to the administrator of the EPA.

On July 23, 1987, the EPA issued its "Final Decision." The EPA generally adopted the ALJ's "Initial Decision," found that A.Y. McDonald had violated RCRA, and assessed a civil penalty against the company. In addition, the EPA required A.Y. McDonald to submit a closure and postclosure plan and a groundwater assessment plan as well as requiring the company to fully implement these plans.

On August 19, 1987, A.Y. McDonald, the Iowa department of transportation (IDOT),[1] and the EPA entered into a consent order pursuant to section 106 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA). *See* 42 U.S.C. § 9601, *et seq.*, as amended by the Superfund Amendments and Reauthorization Act of 1986. The consent order required A.Y. McDonald to (1) design and construct a clay cap over a specified portion of the property; (2) expand its groundwater monitoring system; and (3) develop and implement a postclosure plan for a period of thirty years.

## II. *The Certified Questions.*

In its certification order the federal district court certified the following three questions to us:

1. Does the language "all sums which the insured shall become legally obligated to pay as damages because of ... property damage" or similar language as used in the policies issued to plaintiff by defendants The Aetna Casualty and Surety Company, American Insurance Company and National Surety Corporation (collectively "FFIC") and Insurance Company of North America include coverage for amounts expended or paid by plaintiff in order to comply with the terms of the EPA's decision issued July 23, 1987, pursuant to RCRA, and to comply with the terms of the consent order entered into on August 19, 1987, by plaintiff, the EPA and IDOT pursuant to CERCLA? If so, do these words encompass all or only part of such amounts expended or paid?

2. Does the language contained in the policies issued to plaintiff by American Employers Insurance Company and Employers Reinsurance Corporation include such coverage as outlined in Question 1:

> I. COVERAGES: To indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability imposed upon him by law or liability assumed by him under contract or agreement for damages, and expenses, all as included in the definition of "ultimate net loss", ...

American Employers Insurance Company policies.

### SECTION I

COVERAGE. The Corporation hereby agrees to indemnify the insured against such ultimate net loss in excess of the insured's primary liability as the insured sustains by reason of liability, imposed upon the insured by law or assumed by the insured under contract, for damages because of personal injury or property damage to

---

1. The department had purchased the site on September 1, 1982, and leased it back to A.Y.

McDonald until November 1, 1983.

which this policy applies, caused by an occurrence anywhere in the world.

Employers Reinsurance Corporation policies.

3. Did Insurance Company of North America have a duty to defend plaintiff during the proceedings before the EPA based on the language in Insurance Company of North America's policy that Insurance Company of North America "shall have the right and duty to defend any suit against the insured"? In other words, were the proceedings before the EPA a "suit"?

III. *The Federal Environmental Legislation.*

Before proceeding to the merits, we think it would be instructive to trace the development of federal environmental legislation. Congress took the first step in modern federal environmental regulation with the passage of the Clean Air Act Amendments of 1970. Pub.L. No. 91–604, 84 Stat. 1676, now codified as amended at 42 U.S.C. §§ 7401 *et seq.* Two years later Congress took the second step with the passage of the Federal Water Pollution Control Act Amendments of 1972. Pub.L. No. 92–500, 86 Stat. 816, 33 U.S.C. §§ 1251–1376.

It soon became clear to Congress that there was no existing federal law to regulate the disposal of environmental pollutants, including solid wastes and hazardous wastes, on land. To close this loophole in federal environmental law, Congress enacted RCRA in 1976. *See United States v. Shell Oil Co.,* 605 F.Supp. 1064, 1070 (D.Colo.1985). At the time RCRA was passed it was characterized as a "prospective cradle-to-grave regulatory regime governing the movement of hazardous waste in our society." *United States v. Price,* 577 F.Supp. 1103, 1109 (D.N.J.1983) (citing Goldfarb, *The Hazards of Our Hazardous Waste Policy,* 19 Nat. Resources J. 249, 253 (1979)).

RCRA authorizes the EPA to promulgate regulations applicable to generators of hazardous waste, transporters of hazardous waste, and owners and operators of hazardous waste treatment, storage and disposal facilities. The Act regulates record keeping practices, labeling practices, use of appropriate containers, use of a manifest system, and the design, construction, operation, and maintenance of facilities. *See* 42 U.S.C. §§ 6921–34; 40 C.F.R. Parts 260–67 and 270 (1990); *see also Shell Oil Co.,* 605 F.Supp. at 1070.

Congress soon discovered that RCRA was not the complete answer to environmental waste control. One court saw the problem this way:

Land pollution presented a problem not encountered with air and water pollution. Air and navigable waters are, generally speaking, self-cleansing through time. Carbon monoxide in air and phosphates in water can thus be abated by limiting or eliminating present sources of pollution. But hazardous wastes deposited on land do not simply disperse into harmless concentrations. They can percolate through the soil and infiltrate ground water; and they can persist over long periods of time. Congress, faced with sites such as Love Canal, clearly understood that the mere regulation of current land disposal would not adequately protect the public health and welfare or the environment.

*Shell Oil Co.,* 605 F.Supp. at 1070–71.

The deficiencies in RCRA were officially noted in a congressional report:

Deficiencies in RCRA have left important regulatory gaps. The Act is prospective and applies to past sites only to the extent that they are posing an imminent hazard. Even there the Act is of no help if a financially responsible owner of the site cannot be located.

H.R.Rep. No. 1016, 96th Cong.2d Sess. 22, *reprinted in* 1980 U.S.Code Cong. & Admin.News 6119, 6125. In short, legislation was needed to clean up inactive sites where wastes had been dumped in the past. In addition such legislation would need to insure that those responsible for the environmental damage would bear the costs of this activity.

In response to these deficiencies Congress enacted CERCLA. As one writer

describes it, CERCLA was designed "to bring order to the array of partly redundant, partly inadequate federal hazardous substances cleanup and compensation laws." F. Anderson, D. Mandelker & A. Tarlock, *Environmental Protection: Law and Policy* 568, 568 (1984).

CERCLA's objectives include the following:

> to encourage maximum care and responsibility in the handling of hazardous waste; to provide for rapid response to environmental emergencies; to encourage voluntary clean-up of hazardous waste spills; to encourage early reporting of violations of the statute; and to ensure that parties responsible for release of hazardous substances bear the costs of response and costs of damage to natural resources.

*Chemical Waste Management, Inc. v. Armstrong World Indus., Inc.,* 669 F.Supp. 1285, 1290 n. 6 (E.D.Pa.1987).

CERCLA gives the federal government broad authority to combat contamination of the environment and to protect the health and welfare of the public. The Act imposes liability on parties responsible for the "incurrence of response costs" resulting from "a release, or a threatened release," of a "hazardous substance." 42 U.S.C. § 9607(a). The responsible parties include (1) current owners and operators of hazardous waste facilities; (2) any person who formerly owned or operated a facility at the time of the disposal of any hazardous substance; and (3) waste generators, disposers, and transporters. *Id.* Responsible parties can be liable for

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person

consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of [the Act].

*Id.*

The Act defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22). There are four exceptions to the definition, and none are relevant here.

"Environment" is defined to include "surface water, ground water, ... land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States." 42 U.S.C. § 9601(8).

A "hazardous substance" includes "any element, compound, mixture, solution, or substance" covered under certain federal environment statutes, including "hazardous waste" under RCRA and substances designated by the EPA under 42 U.S.C. § 9602. 42 U.S.C. § 9601(14). Lead, the offending element here, is designated as a "hazardous substance." *See* 40 C.F.R. § 302.4, at 178.

CERCLA was designed "to deal with every conceivable area where hazardous substances come to be located." *New York v. General Elec. Co.,* 592 F.Supp. 291, 296 (N.D.N.Y.1984). It provides two different responses: removal efforts and remedial actions. *See* 42 U.S.C. §§ 9601(23), 9601(24). The removal efforts response involves typically short-term cleanup arrangements. *See* 42 U.S.C. § 9601(23).[2]

---

**2.** Under this provision the term "remove" or "removal" means "the cleanup or removal of released hazardous substances from the environment, such actions as may be [necessarily] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment...."

Remedial actions response is generally long-term or permanent containment. Such a response may also involve disposal programs. *See* 42 U.S.C. § 9601(24).[3]

The terms "respond" or "response" mean "remove, removal, remedy, and remedial action." 42 U.S.C. § 9601(25). All of these terms also include enforcement activities relating to them. *See id.*

Costs in connection with these responses are commonly referred to in the cases and literature as "response costs" or "cleanup costs."

Here the design and construction of the clay cap, the expansion of the groundwater monitoring system, and the development and implementation of a postclosure plan for a period of thirty years constituted a remedial action response covered by 42 U.S.C. § 9601(24).

In responding to a hazardous waste problem, CERCLA gives the EPA three alternatives. Using Superfund money,[4] the EPA may clean up the site and seek reimbursement from the responsible parties for the costs incurred. *See* 42 U.S.C. §§ 9604(a)(1), 9607. Or the EPA may seek injunctive relief to require the responsible parties to clean up the site. *See* 42 U.S.C. § 9606(a).

In addition section 9606(a) provides a third alternative. The EPA may issue an administrative order requiring the responsible parties to clean up the site. A violation of, or a failure or refusal to comply with, this order carries a fine of not more than $25,000 "for each day in which such violation occurs or such failure to comply continues." 42 U.S.C. § 9606(b)(1). In addition, the responsible parties may be liable

to the United States for punitive damages if they fail to comply with the order. 42 U.S.C. § 9607(c)(3).

The EPA may enter into an agreement with the responsible parties to perform any necessary response action. *See* 42 U.S.C. § 9622(a). The agreement must be "entered in the appropriate United States district court as a consent decree." 42 U.S.C. § 9622(d)(1)(A). Apparently this is the route the EPA took with A.Y. McDonald.

## IV. *A.Y. McDonald's Suit.*

In its petition for declaratory relief A.Y. McDonald claims it has incurred and will continue to incur substantial response costs as a result of the EPA proceedings. These costs include engineering fees, personnel costs, construction costs, postclosure monitoring costs, and other costs necessary to comply with the consent order. The company has also incurred a civil penalty. A.Y. McDonald seeks a declaration that these response costs and the penalty are damages within the insuring provision of the CGL policies and therefore covered by the policies.

A.Y. McDonald also claims it has incurred legal expenses in defending itself throughout the EPA proceedings. A.Y. McDonald seeks a declaration that the defendants had a duty to defend it before the EPA and that their refusal to do so was a breach of the duty to defend provision in the policies. A.Y. McDonald therefore seeks a declaration that the defendants should reimburse it for these legal expenses.

---

3. Under this provision "remedy" or "remedial action" generally means "those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, ... [and] includes ... such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials ... and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment...."

4. Section 9611 authorized a federal fund from which the popular "Superfund" pseudonym of CERCLA came. In the initial Act Congress allocated $1.6 billion for this trust fund. *See* 42 U.S.C. § 9611 (1982). Amended in 1986, section 9611 now authorizes $8.5 billion for use over a five-year period. *See* 42 U.S.C. § 9611(a) (1988). The funds for the Superfund come from taxes collected on petroleum products and certain inorganic chemicals as well as from federal revenue. *See* 26 U.S.C.A. § 9507(b) (West 1989).

## V. *The Coverage Question.*

That leads us to the first certified question: whether the response costs and the penalty are covered by the CGL policies here.

There are persuasive arguments for and against permitting insurance against the costs of abating pollution. But we think these arguments are not relevant on the question of coverage. CERCLA expressly permits responsible parties to insure against the costs of relief under this legislation. *See* 42 U.S.C. § 9607(e). From this we conclude that Congress has already made the relevant public policy determinations. So our task is not to determine whether the policies may provide the coverage A.Y. McDonald seeks, but whether they do provide it according to their terms. The answer lies solely in the language of the policies, not in public policy considerations.

The coverage question centers on the following language in the CGL policies: "all sums which the insured shall become legally obligated to pay as damages because of ... property damage." Our task is to determine whether this language covers the response costs that A.Y. McDonald has incurred and will incur and the penalty assessed against it. Numerous state appellate courts have considered the response cost coverage issue. Nearly all have concluded that response or cleanup costs incurred under environmental protection statutes are indeed covered by policy language identical to the language under considera-

tion.[5] The highest courts in Massachusetts, Minnesota, North Carolina, Washington, and Wyoming are included in the majority; the highest courts in Maine and New Hampshire are included in the minority.

Some of these decisions deal with costs of reimbursing the government or third parties for their costs in remedying and mitigating environmental damage. In finding coverage for these costs, courts in these cases have relied on either one of two theories. Such costs are plainly "damages" that the insured is "legally obligated" to pay as compensatory damages because of "property damage." *See, e.g., Broadwell Realty Servs., Inc. v. Fidelity & Cas. Co. of New York*, 218 N.J.Super. 516, 526, 528 A.2d 76, 81 (1987); *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wash.2d 869, 878, 784 P.2d 507, 511 (1990). Or these terms—damages and legally obligated—are ambiguous and therefore must be resolved in favor of coverage. *See, e.g., AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 841, 799 P.2d 1253, 1278, 274 Cal.Rptr. 820, 845 (1990); *United States Fidelity & Guar. Co. v. Specialty Coatings Co.*, 180 Ill.App.3d 378, 391, 129 Ill.Dec. 306, 315, 535 N.E.2d 1071, 1080, *appeal denied*, 127 Ill.2d 643, 136 Ill.Dec. 609, 545 N.E.2d 133 (1989); *Hazen Paper Co. v. United States Fidelity & Guar. Co.*, 407 Mass. 689, 700, 555 N.E.2d 576, 583 (1990); *Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 179–81 (Minn.1990); *C.D. Spangler Constr. Co. v. Industrial Crankshaft & Eng'g Co.*, 326 N.C. 133,

**5.** *See, e.g., AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 837, 799 P.2d 1253, 1275, 1279–80, 274 Cal.Rptr. 820, 842 (1990); *United States Fidelity & Guar. Co. v. Specialty Coatings Co.,* 180 Ill.App.3d 378, 383–88, 129 Ill.Dec. 306, 310–13, 535 N.E.2d 1071, 1075–78, *appeal denied,* 127 Ill.2d 643, 136 Ill.Dec. 609, 545 N.E.2d 133 (1989); *Hazen Paper Co. v. United States Fidelity & Guar. Co.,* 407 Mass. 689, 700, 555 N.E.2d 576, 583 (1990); *United States Aviex Co. v. Travelers Ins. Co.,* 125 Mich.App. 579, 589–90, 336 N.W.2d 838, 843 (1983); *Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.,* 457 N.W.2d 175, 184 (Minn.1990); *Broadwell Realty Servs., Inc. v. Fidelity & Cas. Co. of New York,* 218 N.J.Super. 516, 526, 528 A.2d 76, 81 (1987); *Lansco, Inc. v. Department of Env't Protection,* 138 N.J.Super. 275, 284, 350 A.2d 520, 525 (1975), *aff'd,* 145

N.J.Super. 433, 368 A.2d 363 (1976), *cert. denied,* 73 N.J. 57, 372 A.2d 322 (1977); *Kutsher's Country Club Corp. v. Lincoln Ins. Co.,* 119 Misc.2d 889, 893, 465 N.Y.S.2d 136, 139–40 (1983); *C.D. Spangler Constr. Co. v. Industrial Crankshaft & Eng'g Co.,* 326 N.C. 133, 152–53, 388 S.E.2d 557, 568–69 (1990); *Boeing Co. v. Aetna Cas. & Sur. Co.,* 113 Wash.2d 869, 888, 784 P.2d 507, 516 (1990); *Compass Ins. Co. v. Cravens, Dargan & Co.,* 748 P.2d 724, 730 (Wyo.1988). *Contra Patrons Oxford Mut. Ins. Co. v. Marois,* 573 A.2d 16, 18–19 (Me.1990); *Troy Mills, Inc. v. Aetna Cas. & Sur. Co.,* No. 86–E–054, slip op. (N.H.Super.Ct. June 20, 1989), *appeal vacated and decision below summarily aff'd,* No. 89–311, slip op. (N.H.Sup.Ct. Feb. 13, 1990); *Braswell v. Faircloth,* 300 S.C. 338, 344, 387 S.E.2d 707, 710 (S.C.App.1989).

152, 388 S.E.2d 557, 569 (1990). *Contra Braswell v. Faircloth,* 300 S.C. 338, 344, 387 S.E.2d 707, 710 (S.C.App.1989).

A more troublesome question concerns costs incurred in compliance with environmental injunctions. But even here, most state appellate courts have held that these costs are likewise covered. Some of these courts view such costs as fitting the ordinary meaning of "damages." *See, e.g., AIU Ins. Co.,* 51 Cal.3d at 825, 799 P.2d at 1267, 274 Cal.Rptr. at 834; *Specialty Coatings Co.,* 180 Ill.App.3d at 390–93, 129 Ill. Dec. at 314–16, 535 N.E.2d at 1079–81; *Boeing Co.,* 113 Wash.2d at 877, 784 P.2d at 511. And some are convinced that a contrary holding would unreasonably make coverage depend on the "mere fortuity" of which alternatives—injunction, reimbursement, or damages to natural resources—the EPA chooses in enforcing CERCLA. *See, e.g., AIU Ins. Co.,* 51 Cal.3d at 840, 799 P.2d at 1277, 274 Cal.Rptr. at 844; *C.D.*

*Spangler Constr. Co.,* 326 N.C. at 150, 388 S.E.2d at 568; *United States Aviex Co. v. Travelers Ins. Co.,* 125 Mich.App. 579, 590, 336 N.W.2d 838, 843 (1983). Other courts reason that such costs are damages according to the reasonable expectations of the parties. *See, e.g., AIU Ins. Co.,* 51 Cal.3d at 840, 799 P.2d at 1277–78, 274 Cal.Rptr. at 844–45; *C.D. Spangler Constr. Co.,* 326 N.C. at 152, 388 S.E.2d at 568–69; *Broadwell Realty Servs., Inc.,* 218 N.J.Super. at 524, 528 A.2d at 80.

In contrast, federal courts are sharply divided on the question whether environmental response or cleanup costs are covered by the CGL policies. In their decisions, these courts purport to apply state law in resolving the issue. Like the majority of state courts, some federal courts see both forms of relief—recovery of cleanup costs and costs of compliance with environmental injunctions—as constituting "damages" under the CGL policies.[6]

---

**6.** *See, e.g., Hays v. Mobil Oil Corp.,* 930 F.2d 96, 100–01 (1st Cir.1991) (applying Massachusetts law) (relying on *Hazen,* 407 Mass. 689, 555 N.E.2d 576 (1990)); *Avondale Indus., Inc. v. Travelers Indem. Co.,* 887 F.2d 1200, 1207, 1203 (2d Cir.1989) (applying New York law) (finding that remedial costs for the cleanup of a waste site are damages under a CGL policy), *reh'g denied,* 894 F.2d 498, *cert. denied,* —— U.S. ——, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990); *Port of Portland v. Water Quality Ins. Syndicate,* 796 F.2d 1188, 1193–94 (9th Cir.1986) (applying Oregon law) (finding state supreme court would hold that discharging pollution into water causes damage to tangible property; consequently, cleanup costs are recoverable under a property damage liability clause); *Upjohn Co. v. Aetna Cas. & Sur. Co.,* 768 F.Supp. 1186 (W.D.Mich.1990) (applying Michigan law) (finding cleanup costs recoverable as sums the insured is liable to pay as a result of property damage); *National Indem. Co. v. United States Pollution Control, Inc.,* 717 F.Supp. 765, 766–67 (W.D.Okla.1989) (applying Oklahoma law) (construing meaning of damages in its ordinary and popular sense, holding that damages should include monies pursued under CERCLA for response and cleanup of environmental contamination caused by toxic waste); *Allstate Ins. Co. v. Quinn Constr. Co.,* 713 F.Supp. 35, 40–41 (D.Mass.1989) (applying Massachusetts law) (deciding "owned property" exclusion in CGL policy no bar to recovering cleanup costs resulting from environmental contamination that presents a demonstrated danger to another's property); *Chesapeake Utils. Corp. v. American Home Assurance Co.,* 704 F.Supp. 551, 558–65

(D.Del.1989) (applying Maryland law under Delaware choice of law rules and Delaware law) (in applying Maryland law, deciding the term "damages" does not exclude as a matter of law the insured's costs incurred in cleaning up Maryland site, thereby rejecting reasoning of *Maryland Cas. Co. v. Armco, Inc.,* 822 F.2d 1348 (4th Cir.1987), *cert. denied,* 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988) as misstatement of Maryland law; in applying Delaware law, affirming rule that the term "damages," if not otherwise defined in an insurance contract, includes equitable remedies imposed on insured such as cleanup costs); *Intel Corp. v. Hartford Accident & Indem. Co.,* 692 F.Supp. 1171, 1186–95 (N.D.Cal.1988) (applying California law) (concluding that state supreme court would hold that costs incurred by an insured in investigating and cleaning up pollution [particularly hazardous waste] which damages public property and poses an established threat to public health are covered by terms of a CGL policy); *United States Fidelity & Guar. Co. v. Thomas Solvent Co.,* 683 F.Supp. 1139, 1168–70 (W.D.Mich.1988) (applying Michigan law) (holding that once property damage is found as a result of environmental contamination, cleanup costs should be recoverable under CGL policy as monies the insured was liable to pay as a result of that property damage); *Centennial Ins. Co. v. Lumbermens Mut. Cas. Co.,* 677 F.Supp. 342, 349–50 (E.D.Pa.1987) (applying Pennsylvania law) (deciding costs incurred in cleaning up property damage caused by toxic contamination are damages covered by a CGL policy); *New Castle County v. Hartford Accident & Indem. Co.,* 673 F.Supp. 1359, 1364–67, 1361 (D.Del.1987)

For various reasons other federal courts have reached the opposite result regarding these two forms of relief. One reason centers on the separate provisions in CERCLA. One provision allows the EPA to recover for damages to natural resources, while another provision allows the EPA to recover response costs. *See* 42 U.S.C. §§ 9607(a)(4)(C), 9607(a)(4)(A). Because the statute makes such a distinction, several federal courts have reasoned that only "damages to natural resources," and not response costs, can be considered as damages under the CGL policies. *See, e.g., Aetna Cas. & Sur. Co. v. Gulf Resources & Chem. Corp.,* 709 F.Supp. 958, 961 (D.Idaho 1989); *Verlan, Ltd. v. John L. Armitage & Co.,* 695 F.Supp. 950, 954–55 (N.D.Ill.1988); *Travelers Ins. Co. v. Ross Elec. of Washington, Inc.,* 685 F.Supp. 742, 743–45 (W.D.Wash.1988); *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.,* 842 F.2d 977, 986–87 (8th Cir.), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) (*NEPACCO*); *Mraz v. Canadian Universal Ins. Co.,* 804 F.2d 1325, 1329 (4th Cir.1986).

Some federal courts have noted that under CERCLA the EPA can recover response costs without a showing that the agency has suffered harm to property or resources in which it has a proprietary interest. These courts reason that such a recovery is not for "damages" as that term has been traditionally defined in the law, and so have denied coverage. *See, e.g., Aetna Cas. & Sur. Co.,* 709 F.Supp. at 961; *Mraz,* 804 F.2d at 1329.

Several federal courts have concluded that the term "damages" under CGL policies has a legal, technical meaning that is unambiguous in the insurance context. Under this meaning these courts have found that the term "damages" does not include costs of complying with injunctive relief available under CERCLA and similar statutes. These courts note that the policies there—as here—obligate the insurer to pay "all sums which the insurer shall become legally obligated to pay as damages because of ... property damage." They point out that if the term "damages" were given its ordinary meaning then the term "would become mere surplusage, because any obligation to pay would be covered. The limitation implied by employment of the phrase 'to pay as damages' would be obliterated." *Maryland Cas. Co. v. Armco, Inc.,* 822 F.2d 1348, 1352 (4th Cir.1987), *cert. denied,* 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988); *accord NEPACCO,* 842 F.2d at 986; *see also, Travelers Indem. Co. v. Allied–Signal, Inc.,* 718 F.Supp. 1252, 1255 (D.Md.1989); *Aetna Cas. & Sur. Co.,* 709 F.Supp. at 961; *Verlan, Ltd.,* 695 F.Supp. at 954; *Ross Elec.,* 685 F.Supp. at 744.

In reaching this conclusion, *Armco* and *NEPACCO* rely on several decisions involving injunctive relief. *See NEPACCO,* 842 F.2d at 986; *Armco,* 822 F.2d at 1353. All were decided before CERCLA, and all hold that an insured's costs of complying with mandatory injunctions are not "damages" under a liability insurance policy. *See, e.g., Aetna Cas. & Sur. Co. v. Hanna,* 224 F.2d 499, 503 (5th Cir.1955); *Garden Sanctuary, Inc. v. Insurance Co. of N. Am.,* 292 So.2d 75, 77 (Fla.App.1974); *Desrochers v. New York Cas. Co.,* 99 N.H. 129, 131, 106 A.2d 196, 198 (1954).

Another reason given for denying such coverage lies in the distinction between equitable and legal relief. The two federal circuits that have given the term "damages" a legal, technical meaning look to

(holding government suit for recovery of response costs under CERCLA is covered by CGL policies damage clause); *Township of Gloucester v. Maryland Cas. Co.,* 668 F.Supp. 394, 398–400 (D.N.J.1987) (applying New Jersey law) (finding that costs of cleanup and closure are damages under CGL policies); *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.,* 662 F.Supp. 71, 74–75 (E.D.Mich.1987) (mem.) (applying Michigan law) (concluding that damages under CGL policies include money spent cleaning up environ-

mental contamination); *United States v. Conservation Chem. Co.,* 653 F.Supp. 152, 187–94 (W.D.Mo.1986) (applying Missouri law) (concluding economic losses in the form of response and cleanup costs are damages caused by or arising from environmental harm for purposes of CGL policies); *Independent Petrochem. Corp. v. Aetna Cas. & Sur. Co.,* 654 F.Supp. 1334, 1359 (D.D.C.1986) (applying Missouri law) (determining sums that are cleanup costs constitute damages under liability insurance coverage).

whether the form of relief sought is legal or equitable. Both reason that legal damages—payments to third persons when those persons have a legal claim for damages—are substantially different from injunction, restitution, or other equitable remedies. They conclude, therefore, that the term "damages" in the legal sense does not include these equitable remedies. And they conclude that a reasonably prudent insurance purchaser would expect that an insurance policy limited to "damages" would not cover restitution or injunctive costs. *See NEPACCO*, 842 F.2d at 985–86; *Armco*, 822 F.2d at 1352; *Cincinnati Ins. Co. v. Milliken & Co.*, 857 F.2d 979, 981 (4th Cir.1988); *Mraz*, 804 F.2d at 1329; *United States Fidelity & Guar. Co. v. Morrison Grain Co.*, 734 F.Supp. 437, 449 (D.Kan.1990); *Verlan, Ltd.*, 695 F.Supp. at 953; *Ross Elec.*, 685 F.Supp. at 744–45.

The eighth and the fourth circuits look upon response costs under CERCLA as either restitutionary (where the government seeks reimbursement) or injunctive (where the responsible party is ordered to clean up the site). Because of the way they view response costs, these courts would deny coverage for them under the CGL policies. *NEPACCO*, 842 F.2d at 986–87; *Armco*, 822 F.2d at 1352–54.

To resolve the coverage question, we need to address two issues. First, are government mandated response costs under CERCLA "damages" within the meaning of the CGL policies? Second, are such costs the measure of "property damage," that is, "damages because of property damage"? Before we can say there is coverage, we must answer both questions affirmatively.

A. "Damages" within the meaning of CGL policies.

The CGL policies obligate the defendants to pay "all sums which the insured shall become legally obligated to pay as damages because of ... property damage." The defendants say this provision does not obligate them to pay "*all* sums" which the insured shall become legally obligated to pay. To the contrary, the defendants say

they have agreed to indemnify the insured for all sums the insured is legally obligated to pay "as damages." They argue that the term "damages" therefore limits the "all sums" provision in the policy. In the defendants' view, the term "damages" provides the key to their obligation to pay all sums imposed upon the insured by law due to property damage.

The defendants want us to give the term "damages" the narrow, technical definition given to it by *NEPACCO* and *Armco*.

■ Because the policies do not define damages, we are left with the task of interpreting its meaning. And, as the federal district court found, this interpretation question is one controlled by state law. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188, 1194, *cert. denied*, 305 U.S. 637, 59 S.Ct. 108, 83 L.Ed. 410, *reh'g denied*, 305 U.S. 673, 59 S.Ct. 229, 83 L.Ed. 436 (1938). The federal district court also found that Iowa law controls. None of the parties dispute this finding.

■ Construction of an insurance policy—the process of determining its legal effect—is a question of law for the court. Interpretation—the process of determining the meaning of words used—is also a question of law for the court unless it depends on extrinsic evidence or a choice among reasonable inferences to be drawn. *Farm Bureau Mut. Ins. Co. v. Sandbulte*, 302 N.W.2d 104, 107–08 (Iowa 1981). Because there is no extrinsic factual record before us, the meaning of the term "damages" in the policies is for us to decide.

■ In the construction of insurance policies, the cardinal principle is that the intent of the parties must control; and except in cases of ambiguity this is determined by what the policy itself says. *Cairns v. Grinnell Mut. Reinsurance Co.*, 398 N.W.2d 821, 823 (Iowa 1987); Iowa R.App.P. 14(f)(14).

■ Ambiguity exists if, after the application of pertinent rules of interpretation to the policy, a genuine uncertainty results as to which one of two or more meanings is the proper one. *Fraternal Order of Ea-*

*gles v. Illinois Cas. Co.*, 364 N.W.2d 218, 221 (Iowa 1985). Because insurance policies are in the nature of adhesive contracts, we construe their provisions in a light favorable to the insured. *Cairns*, 398 N.W.2d at 824. So an insurer should clearly and explicitly define any limitations or exclusions to coverage expressed by broad promises. *Id.*

 When words are left undefined in a policy we do not give them a technical meaning. Rather we give them their ordinary meaning, one which a reasonable person would understand them to mean. *Farm & City Ins. Co. v. Potter*, 330 N.W.2d 263, 265 (Iowa 1983). We do not give them the meaning only a specialist or expert would understand. *City of Spencer v. Hawkeye Sec. Ins. Co.*, 216 N.W.2d 406, 408–09 (Iowa 1974). And if such words are susceptible to two interpretations, the interpretation favoring the insured is adopted. *North Star Mut. Ins. Co. v. Holty*, 402 N.W.2d 452, 454 (Iowa 1987). But a mere disagreement on the part of the parties as to the meaning of terms does not automatically establish an ambiguity. *Id.* In this circumstance the test is an objective one: Is the language fairly susceptible to two interpretations? *Id.*

 In searching for the ordinary meaning of undefined terms in a policy, we commonly refer to dictionaries. *See, e.g., Witcraft v. Sundstrand Health & Disability Group Benefit Plan*, 420 N.W.2d 785, 788 (Iowa 1988) (for meaning of "illness"); *North Star*, 402 N.W.2d at 455 (for meaning of "apparatus").

We agree with those courts that have viewed the term "damages" in CGL policies as ambiguous because it is susceptible to more than one reasonable interpretation. As one court put it, the ordinary meaning of "damages" as defined by the dictionary supports this conclusion:

> The policy language, "all sums which the insured shall become legally obligated to pay as damages because of property damage," can reasonably be interpreted to cover any claim asserted against the insured arising out of property damage, which requires the expenditure of money, regardless of whether the claim can be characterized as legal or equitable in nature. This interpretation is supported by the dictionary definition of "damages" which makes no distinction between damages at law and actions in equity. *See* Webster's Third New International Dictionary 571 (P. Gove ed. 1961) ("damages" are "the estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for a wrong or injury caused by [a] violation of a legal right").

*Minnesota Mining*, 457 N.W.2d at 179–80; *accord AIU Ins. Co.*, 51 Cal.3d at 825–26, 799 P.2d at 1267, 274 Cal.Rptr. at 834; *C.D. Spangler Constr. Co.*, 326 N.C. at 152, 388 S.E.2d at 568–69; *Boeing Co.*, 113 Wash.2d at 877, 784 P.2d at 511.

Even insurance dictionaries define "damages" in the same broad manner. *See, e.g.,* Merit, *Glossary of Insurance Terms* 47 (1980) (damages defined as "the amount required to pay for a loss"); Rubin, *Barrons Dictionary of Insurance Terms* 71 (1987) (damages defined as "the sum the insurance company is legally obligated to pay an insured for losses incurred"); Davids, *Dictionary of Insurance* 72 (1977) (damages defined as "the estimated reparation in money for injury sustained").

Interestingly enough, *NEPACCO* and *Armco* concede that the ordinary meaning of the term "damages" is broad and all inclusive:

> The dictionary definition does not distinguish between legal damages and equitable monetary relief. Thus, from the viewpoint of the lay insured, the term "damages" could reasonably include all monetary claims, whether such claims are described as damages, expenses, costs, or losses.

*NEPACCO*, 842 F.2d at 985 (citations omitted); *Armco*, 822 F.2d at 1352 (citations omitted).

This is not the first time our court has been asked to interpret the term "damages" in a CGL policy. We have interpreted the term "damages" broadly to include

"punitive" as well as "compensatory" damages. *City of Cedar Rapids v. Northwestern Nat'l Ins. Co.*, 304 N.W.2d 228, 231 (Iowa 1981), *overruled on other grounds*, 440 N.W.2d 377 (1989). We adopted the following language from a case decided by the Missouri Court of Appeals:

> Clearly the language of the policy before us does not limit recovery to actual or compensatory damages but *undertakes to pay for all losses.*

*Id.* (citing *Colson v. Lloyd's of London*, 435 S.W.2d 42, 43–44, 47 (Mo.App.1968) (emphasis added).

Several years later we said it again: Damages include punitive as well as compensatory damages. *See Skyline Harvestore Sys. Inc. v. Centennial Ins. Co.*, 331 N.W.2d 106, 107 (Iowa 1983). We interpreted the term damages "from the standpoint of what an ordinary man would believe" the term to mean. *Id.* Clearly, we gave damages its ordinary meaning rather than any technical, legalistic meaning. We did not restrict its meaning to compensation paid to a third party for injuries or property damage sustained. Punitive damages are clearly not compensatory damages. Rather they are smart money permitted by the law to deter similar wrongful conduct in the future. *Id.* at 108.

In *City of Cedar Rapids*, we cited with approval a definition of damages that obligates the insurer to "pay for all losses." 304 N.W.2d at 231 (citing *Colson v. Lloyd's of London*, 435 S.W.2d 42, 43–44, 47 (Mo. App.1968)). This definition is certainly consistent with the ordinary meaning of "damages" adopted by the Minnesota court in *Minnesota Mining:* "the estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right." *Minnesota Mining*, 457 N.W.2d at 180. This ordinary meaning is broad enough to encompass payments used to clean up hazardous materials released due to the prior mishandling of such materials. Mountainspring, *Insurance Coverage of CERCLA Response Costs: The Limits of "Damages" in Comprehensive General Liability Policies*, 16

Ecology L.Q. 755, 791 (1989). In short we agree with the majority of courts which hold that the ordinary meaning of "damages" is broad enough to include government mandated response or cleanup costs under CERCLA and similar state environmental protection statutes.

■ Consistent with our approach in *City of Cedar Rapids* and *Skyline Harvestore Systems, Inc.*, we reject the defendants' suggestion that we give "damages" a technical, legalistic meaning. Rather, we give "damages" its ordinary meaning, a meaning the ordinary reasonable person would believe the term to mean. That meaning is this: "the estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right." Webster's Third New International Dictionary 571 (P.Gove ed. 1961). Under this meaning we think a reasonable person purchasing a CGL policy like the one here would expect government mandated response costs under CERCLA to be covered. These are costs A.Y. McDonald has become legally obligated to pay as compensation imposed by law for a wrong. As we shall shortly discuss, these costs are also the result of injuries sustained by the government.

> As one court observed,
> [the insureds] have become legally obligated to clean up their pollution by virtue of the polite but puissant compulsion of CERCLA. At least to the reasonable insured, this obligation is no less a legal sanction than that of a monetary judgment. Indeed, having purchased insurance to cover them for damages because of property damage, [the insureds] would be surprised indeed to learn that coverage depended on whether the proceeding employed to obtain recompense was defined as "legal" or "equitable." An insured reading the coverage clause before us would reasonably conclude it provided coverage for any economic outlay compelled by law to rectify and mitigate property damage caused by the insured's pollution. . . . It would come as an unexpected, if not incomprehensible, shock to

the insureds to discover that their insurance coverage was being denied because the plaintiff chose to frame his complaint in equity rather than at law.

*Aerojet–General Corp. v. Superior Court,* 211 Cal.App.3d 216, 228, 257 Cal.Rptr. 621, 628 (1989).

If the defendants intended a narrow technical definition of the term "damages" ..., it was their duty to make that intention clear. The insureds purchased these "comprehensive general liability" policies expecting coverage against most legal liabilities which could arise out of their own acts or omissions, including liabilities which were unknown at the time. The standard language used in the policy is broad. The insurers agreed that they "will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies caused by an occurrence." The utility of the policy would be seriously called into question if coverage is permitted to hinge on such a fortuitous event as whether a plaintiff bringing an action against the insured has framed his complaint in equity rather than at law. Clearly the insureds under these policies contemplated greater certainty when they purchased the policies. They could reasonably expect the policy to provide coverage for any economic outlay compelled by law to rectify or mitigate damage caused by the insured's acts or omissions.

*Minnesota Mining,* 457 N.W.2d at 181–82. *See also, Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.,* 368 F.Supp. 1098, 1118–19 (S.D.N.Y.1973), *aff'd,* 505 F.2d 989 (2d Cir.1974).

■ We hold that the term "damages" in these CGL policies includes government mandated response costs under CERCLA.

According to two commentators our conclusion would not surprise the insurance industry. These commentators have reviewed the history of the CGL policy, the insurance industry's interpretation of the word "damages" in the industry's internal memoranda, the industry's published literature, and the industry's representations to the courts and to Congress. Based on this review the commentators conclude that

until *Armco,* the insurance industry virtually always construed and used the word "damages" in the broadest sense. The industry clearly understood its standard form CGL policy to cover cleanup costs, whether imposed by CERCLA, common law, legislation analogous to CERCLA, or otherwise.

Stanzler & Yuen, *Coverage for Environmental Cleanup Costs: History of the Word "Damages" in the Standard Form Comprehensive General Liability Policy,* 3 Colum.Bus.L.Rev. 449, 456 (1990).

These authors cite to industry publications touting the fact that the CGL policy was so broad in coverage that no new coverage was needed to encompass unknown hazards. The unknown hazards were automatically covered. *Id.* at 462–65. According to the authors,

[t]he insurance industry's original intent to incorporate into the insuring agreements and into the word "damages" wide, flexible coverage for unknown hazards conflicts with the *Armco* decisions. The industry valued and relied upon the reach of the policy to protect the policyholder against unanticipated changes in circumstances.... [T]he insurance industry anticipated CERCLA liability. Liability under CERCLA fits well within the concept of the unknown hazard the industry designed the standard form CGL to cover.

*Id.* at 464–65; *see also* D. Bickelhaupt, *General Insurance* 522 (1983) (CGL policy "provides full *automatic* coverage ... for the so-called unknown perils, about which the insured knows nothing, or which would usually not be covered by any named-perils policy") (emphasis added); D. Ratcliffe, *General Liability Insurance Handbook* 159 (1959) ("The CGL policy is designed to cover *automatically* the business hazards that come under the head of General Liability.") (emphasis added).

Our inquiry on the coverage question does not end with our conclusion that government mandated response costs un-

der CERCLA are damages within the meaning of the CGL policies. We must next determine whether such costs are the proper measure of property damage. In other words, are these "damages because of property damage" within the meaning of the policies?

### B. "Damages because of property damage".

The pertinent language in the policies—all sums which the insured shall become legally obligated to pay as damages because of ... property damage—clearly requires that "damages" must occur because of property damage. The policies here define property damage in identical or substantially similar language: "Property damage means injury to, loss of use of or destruction of tangible property." A number of cases that have considered the question have held that contamination of the environment constitutes property damage as that term is used in the CGL policies.[7]

In addition many courts recognize that the improper release of toxic wastes may cause property damage not only to the actual owner of the land, but also to the government. The government, these courts point out, has an "interest independent of and behind the titles of its citizens in all the air and earth (that is, its natural resources) within [its] domain."[8]

Response or cleanup costs "are essentially compensatory damages for injury to

**7.** *See, e.g., Continental Ins. Co. v. Northeastern Pharmaceutical & Chem. Co.,* 842 F.2d 977, 983 (8th Cir.) ("However, we agree that environmental contamination caused by improper disposal of hazardous wastes can constitute 'property damage.'"), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) (*NEPACCO*); *Port of Portland,* 796 F.2d at 1194 (oil pollution to water is injury to tangible property); *Chesapeake Utils. Corp.,* 704 F.Supp. at 566 (contamination of soil and groundwater is damage to property); *Intel Corp.,* 692 F.Supp. at 1185–86 (contamination of underground water is damage to tangible property); *New Castle County,* 673 F.Supp. at 1366 (contamination of surface and groundwater is damage to property); *Conservation Chem. Co.,* 653 F.Supp. at 194 (environmental harm arising out of release or escape of toxic chemicals and waste material constitutes property damage); *AIU Ins. Co.,* 51 Cal.3d at 842, 799 P.2d at 1260, 1279, 274 Cal.Rptr. at 846 (contamination of hazardous waste disposal sites, groundwater under the sites, aquifers beneath adjoining property, and surrounding surface water is property damage); *Aerojet–General Corp. v. Superior Court,* 211 Cal.App.3d 216, 229, 257 Cal.Rptr. 621, 629 (1989) (pollution of ground and river water is damage to property); *Hazen Paper Co.,* 407 Mass. at 698, 555 N.E.2d at 582 (contamination of soil and groundwater is property damage); *United States Aviex Co.,* 125 Mich.App. at 589, 336 N.W.2d at 843 (contamination of subterranean and percolating water resulting from fire is physical injury to tangible property); *Minnesota Mining,* 457 N.W.2d at 182 (pollution of groundwater is damage to property); *C.D. Spangler Constr. Co.,* 326 N.C. at 146, 388 S.E.2d at 565 (contamination of groundwater and soil is property damage); *Kipin Indus., Inc. v. American Universal Ins. Co.,* 41 Ohio App.3d 228, 230, 535 N.E.2d 334, 337 (1987) (contamination to land and water is damage to property); *Boeing Co.,* 113 Wash.2d at 886, 784

P.2d at 516 (hazardous wastes leaking into the ground contaminating the groundwater, aquifer and adjoining property is property damage); *Compass Ins. Co. v. Cravens, Dargan & Co.,* 748 P.2d 724, 726, 729 (Wyo.1988) (oil spill from storage tanks flowing into irrigation ditch and carried by water onto adjacent sites caused property damage).

**8.** *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.,* 811 F.2d 1180, 1187 (8th Cir.) (quoting *Georgia v. Tennessee Copper Co.,* 206 U.S. 230, 237, 27 S.Ct. 618, 619, 51 L.Ed. 1038, 1044 (1907) which held that state and federal governments suffer injury to their quasi-sovereign interests when pollutants are released into the soil and air within their jurisdiction), *reh'g granted,* 815 F.2d 51 (1987), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *NEPACCO,* 842 F.2d at 983; *accord Intel Corp.,* 692 F.Supp. at 1185–86 (contamination of underground water is damage to property belonging to a third party because such water is a public resource); *Aerojet–General Corp.,* 211 Cal.App.3d at 229, 257 Cal.Rptr. at 629 ("[T]he state and federal governments are third party property owners for purposes of insurance coverage. Pollution of the ground and river waters is damage to public property, as well as a direct injury to public welfare."); *Minnesota Mining,* 457 N.W.2d at 182 ("Pollution of the groundwater is damage to public property.... The state on behalf of its citizens has a proprietary interest in the natural resources of Minnesota."); *C.D. Spangler Constr. Co.,* 326 N.C. at 146, 388 S.E.2d at 565 ("State's interest in protecting its natural resources is a form of property right. [So] ... injury to these resources constitutes 'property damage' within the meaning of the policies."); *Kipin Indus., Inc.,* 41 Ohio App.3d at 230, 535 N.E.2d at 337 ("'[P]roperty' [as used in policy] includes the interests of the federal and state governments in the tangible environment and its safety.").

[government] property." *United States Fidelity & Guar. Co. v. Thomas Solvent Co.*, 683 F.Supp. 1139, 1168 (W.D.Mich. 1988); *Specialty Coatings Co.*, 180 Ill. App.3d at 392, 129 Ill.Dec. at 315, 535 N.E.2d at 1080. In other words, the damages to natural resources is simply measured in the cost to restore them to their original state. *Ohio v. United States Dep't of the Interior*, 880 F.2d 432, 441–45, 459 (D.C.Cir.) (holding that cost of restoration is the proper measure of "damages" under CERCLA, even if greater than the diminution in value of the damaged property), *reh'g denied*, 897 F.2d 1151 (D.C.Cir. 1989); *Aerojet–General Corp.*, 211 Cal. App.3d at 231, 257 Cal.Rptr. at 630; *United States Aviex Co.*, 125 Mich.App. at 589, 336 N.W.2d at 843; *Waste Management of Carolinas, Inc. v. Peerless, Ins. Co.*, 72 N.C.App. 80, 93, 323 S.E.2d 726, 735 (1984), *rev'd on other grounds*, 315 N.C. 688, 340 S.E.2d 374, *reh'g denied*, 316 N.C. 386, 346 S.E.2d 134 (1986).

This court has likewise allowed reasonable costs of restoration of property, including cleanup costs. *See, e.g., Conrad v. Board of Supervisors*, 199 N.W.2d 139, 142 (Iowa 1972). In *Conrad*, farm owners sued the county for polluting their farm pond. Lignin sulfite, which the county had used on a crushed rock road to reduce the loss of rock and hold down the dust, had found its way to the pond after heavy rains. This court held that the plaintiffs were entitled to recover the reasonable and necessary costs to restore the pond to its previous condition. *Id.* at 142.

The reasonable cost to restore property to its status quo is but one proper measure of damage to property which is harmed because of pollution. Another proper measure is the difference between the market value of the property before contamination and the market value after contamination. *Mel Foster Co. Properties, Inc. v. American Oil Co.*, 427 N.W.2d 171, 174 (Iowa 1988) (owner of property which was contaminated by leakage of gasoline brought nuisance action against owners of sources). This measure of damages is analogous to one codified at 42 U.S.C. § 9607(c) which is used when the EPA sues for "damages for injury to, destruction of, or loss of natural resources." 42 U.S.C. § 9607(a)(4)(C).

Case law has generally held that "damages" in the CGL policy includes costs of preventive measures taken to prevent or halt continuing damages. *See, e.g., American Economy Ins. Co. v. Commons*, 26 Or.App. 153, 156, 552 P.2d 612, 613 (1976); *Globe Indem. Co. v. People*, 43 Cal.App.3d 745, 751–52, 118 Cal.Rptr. 75, 79–80 (1974). In *Commons*, a fire that broke out on the insured's property subsequently spread to adjacent property. The State put out the fire and sought to recover its fire suppression costs from the insureds. The court noted that

> [t]he policy does not limit coverage to property damage but instead covers damages *because of* property damage. This latter language is broader and more inclusive than the former. Because the fire spread to forest land on the corporate farm, the state entered and fought the fire. The liability of the property owners, the insureds, for the suppression costs arose because the state fought the fire, and the state did so because there was property damage. It follows that the insurers are liable for the suppression costs since the insureds' liability arose because of the state's action.

*Commons*, 26 Or.App. at 156–57, 552 P.2d at 613.

> There are limitations. For example, [p]reventive measures taken to prevent property damage from occurring at some point in the future, in the absence of past or current property damage, are the obligation of the insured as part of its cost of doing business; preventive measures taken in response to continuing property damage that was unexpected and unintended are within the coverage provided by the policy.

Chesler, Rodburg & Smith, *Patterns of Judicial Interpretation of Insurance Coverage for Hazardous Waste Site Liability*, 18 Rutgers L.J. 9, 67 (1986–87).

Courts have applied the preventive measures principle in pollution cases. *See, e.g., Broadwell Realty Servs., Inc.*, 218 N.J.Su-

per. at 516, 528 A.2d at 76. In *Broadwell*, the insured's underground tank seeped gasoline into adjacent properties. The insurer argued that "the property owned exclusion" foreclosed coverage for work done on the insured's own property to prevent continued seepage onto the property of third parties. The court rejected the insurer's argument, concluding that the policy covered costs for work done on the property owned by the insured to prevent further gasoline seepage on to the property of others. *Id.* at 528, 528 A.2d at 82.

It is not surprising that recent pollution cases have placed limitations on the preventive measures principle. Property damage must occur before response or cleanup costs are covered. Costs incurred to pay for preventive measures taken in advance of pollution are not "damages because of property damage." But costs for preventive measures taken after such pollution are "damages because of property damage" and so are covered. *See AIU Ins. Co.*, 51 Cal.3d at 842, 799 P.2d at 1279, 274 Cal.Rptr. at 846; *Aerojet–General Corp.*, 211 Cal.App.3d at 237, 257 Cal.Rptr. at 635; *Minnesota Mining*, 457 N.W.2d at 184; *Boeing Co.*, 113 Wash.2d at 887, 784 P.2d at 515–16. The following hypothetical taken from *Aerojet–General Corp.*, illustrates the limitations:

> Petitioners have two underground storage tanks for toxic waste. Tank # 1 has leaked wastes into the soil which have migrated to the groundwater or otherwise polluted the environment. Tank # 2 has not leaked, but government inspectors discover that it does not comply with regulatory requirements, and could eventually leak unless corrective measures are taken. Response costs associated with Tank # 1 will be covered as damages, because pollution has occurred. Tank # 2 would not be covered. Likewise, the expense of capital improvements to prevent pollution in an area of a facility where there is none, or improvements or safety paraphernalia required by government regulation and not causally related to property damage, would not be covered as "damages."

211 Cal.App.3d at 237–38, 257 Cal.Rptr. at 635.

▬ We too think the government's interest in protecting its natural resources is a form of property right. We hold that any injury to the environment resulting from contamination by hazardous waste constitutes "property damage" within the meaning of the CGL policies. We further hold that any injury to the environment resulting from contamination is incurred "because of property damage" and represents the measure of damages to the property. This is true whether such costs are incurred on property owned by the insured, the state or federal government, or third parties. We reach this last conclusion because the coverage provision before us does not specify that coverage depends on the nature or location of property damage. We construe such provision to include damages because of property damage in general, regardless of by whom it is suffered. *Cf. Chesapeake Utils. Corp. v. American Home Assurance Co.*, 704 F.Supp. 551, 556 (D.Del.1989) (reaching same conclusion under facts similar to those here); *AIU Ins. Co.*, 51 Cal.3d at 843, 799 P.2d at 1279, 274 Cal.Rptr. at 846 (same).

▬ In addition we hold that response costs for preventive measures employed after pollution has taken place are incurred "because of property damage" under the CGL policies. However, costs incurred to pay for preventive measures taken in advance of pollution are not incurred "because of property damage."

We think the record—though sparse—is sufficient to raise a genuine issue of material fact concerning damage to the environment resulting from A.Y. McDonald's past practices. As we noted, lead is a hazardous substance under the pertinent regulations. It has been contaminating the foundry site for over thirty years.

We think, however, the record is not sufficient for us to determine whether the remedial measures required by the EPA decision and the consent decree were and will be necessary "because of" property damage. So we cannot precisely say which costs in connection with those measures are covered as "damages." Undoubtedly,

some part of those costs may be covered because they constitute legally compelled expenses for the cleanup of existing pollution. The EPA decision and the consent decree may, however, require expenditures to prevent future pollution that has not yet occurred, or to prevent pollution from a source that has not yet caused pollution. These costs would not be causally related to property damage and so would not be covered as "damages" under the policies. *Cf. Aerojet–General Corp.*, 211 Cal.App.3d at 237, 257 Cal.Rptr. at 634–35 (reaching same conclusion in similar circumstances).

In summary, we think the record is sufficient to generate a material fact question concerning coverage under the insuring language: "all sums which the insured shall become legally obligated to pay as damages because of ... property damage." A.Y. McDonald has polluted the environment by contaminating the soil, a natural resource that constitutes government property. This pollution is injury or damage to such property. Because of this property damage, A.Y. McDonald is legally obligated to clean up the pollution and to prevent further damage. In doing so, A.Y. McDonald has, and will, incur response costs. These costs are compensation for an injury sustained. Or, in the words of the policy, they are "damages."

These response costs are not, as the defendants and some amici claim, economic costs or costs of doing business to comply with some governmental regulation like OSHA's. Costs resulting from compliance with governmental safety regulations are not incurred because of property damage. Rather they are incurred to insure safety. As we said, preventive measures are not covered under the CGL policies in the absence of property damage. *See Minnesota Mining*, 457 N.W.2d at 184.

Nor do we see our interpretation of the term "damages" as rendering that term superfluous in the CGL policies. This argument, as espoused in *NEPACCO* and *Armco*, ignores our holding that only damages incurred because of property damage are covered. When read as a whole, "the language of the policy ... indicates that sums which the insured becomes legally obligated to pay are not covered unless related to 'property damage caused by an occurrence.'" *Minnesota Mining*, 457 N.W.2d at 180 n. 4.

In addition, we are not impressed by the hypertechnical distinction between "legal" and "equitable" forms of relief made in *NEPACCO* and *Armco*. Although purporting to rely on cases holding that injunctive costs are not damages under the CGL policies, we note neither case mentioned *Doyle v. Allstate Insurance Co.*, 1 N.Y.2d 439, 136 N.E.2d 484, 154 N.Y.S.2d 10 (1956).

In *Doyle* the insured who was covered by a CGL policy sued his insurer for costs of successfully defending an injunction suit against the insured. The insurer refused to defend the insured in the suit which was instituted by a neighbor to enjoin the insured from operating a dog kennel on the insured's property. Holding for the insured, the court recognized that if the insured proved he was entitled to equitable relief, equity could grant damages in addition to or as an incident of some other special equitable relief. *Doyle*, 1 N.Y.2d at 443, 136 N.E.2d at 486, 154 N.Y.S.2d at 13. Had damages been awarded in the injunction action, the court concluded the insurer would have been obligated to pay. *Id.* at 443, 136 N.E.2d at 487, 154 N.Y.S.2d at 13. In so holding, the court said:

[T]here can be no doubt that the insurer here undertook (1) to pay on behalf of the insured all sums which the insured became legally obligated to pay as damages by reason of his operating a kennel for dogs, and (2) to defend any suit in which the insured might be legally obligated to pay damages by reason of his operating a kennel for dogs. The policy does not draw any distinction between damages awarded by a court of law and those awarded by a court of equity. The insured was justified in expecting that if suit was instituted against him wherein he might be legally obligated to pay a sum of money as damages because of his operating a dog kennel, the insurer would defend.

*Id.* at 443, 136 N.E.2d at 487, 154 N.Y.S.2d at 14; *see also Johnson v. Carter,* 143 Iowa 95, 100, 120 N.W. 320, 322 (1909) (where equity has obtained jurisdiction, and one of the parties has applied for specific relief found impossible or impracticable, the court will give damages or decree other proper relief).

Our conclusion that CERCLA response costs are a measure of environmental damage renders minor any distinction between equitable and legal damages. The EPA could have cleaned up the site and sued A.Y. McDonald for its response costs. In these circumstances there would have been a clear duty under the policies to pay. *See United States Aviex Co.,* 125 Mich.App. at 589, 336 N.W.2d at 843. From the insured's standpoint it also makes little difference. Whether the damages are legal or equitable, the insured still has to pay.

Finally, we reject any notion that there is any significance in the fact that CERCLA makes a distinction between harm to natural resources and response costs. As one court noted,

[h]owever damages and response costs are measured, we do not believe ... that CERCLA intended that reimbursement of "response costs" be treated as definitionally or conceptually distinct from recovery of "damages." Congress clearly intended considerable overlap between the two forms of recovery. It is clear that response costs can, in certain situations, be recovered as "damages" to natural resources.... Seen in this light, whether recovery of remedial costs is sought under the "response cost" subdivision or that allowing recovery for "damages to natural resources," it can be construed to fall within the scope of the insurance policies at issue here. Moreover, we fail to see how the distinction made by CERCLA between "response costs" and "damages *to natural resources*" forecloses response costs from being characterized as "damages" in a generic sense under CGL policies. More significantly, our ultimate conclusion as to whether reimbursement of response costs is "damages" for insurance purposes is ... predominantly a question

of how, under *state law,* insurance policies should be interpreted.

*AIU Ins. Co.,* 51 Cal.3d at 830–31, 799 P.2d at 1270–71, 274 Cal.Rptr. at 837–38 (citations omitted).

C. Civil penalty.

■ That leaves us to decide whether the penalty imposed by the RCRA decision constitutes "damages" under the policy. Section 6928(g) of RCRA provides:

Any person who violates any requirement of this subchapter shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation. Each day of such violation shall, for purposes of this subsection, constitute a separate violation.

The record leaves no doubt that the civil penalty was imposed because of A.Y. McDonald's failure to comply with notification, permit, and groundwater monitoring regulations under RCRA. This is far different from government mandated response costs resulting from property damage. We hold that the term "damages" under the CGL policies does not include the civil penalty imposed. *See Travelers Ins. Co. v. Waltham Indus. Laboratories Corp.,* 883 F.2d 1092, 1099 (1st Cir.1989) (affirming federal district court finding that because the amount paid by the defendants in state court suit was for "civil penalties" and not "damages," the payment was not covered by the insurance policy's "damages" clause; insurer had no duty to indemnify the defendants for all nor any part of the $27,000 paid in settlement to plaintiff); *Township of Gloucester v. Maryland Cas. Co.,* 668 F.Supp. 394, 401–02 (D.N.J.1987) (fines and civil penalties under state environmental statute held not to constitute "damages" under CGL policy; plaintiff's remedy limited to contractual recovery); *Detrex Chem. Indus., Inc. v. Employers Ins. of Wausau,* 681 F.Supp. 438, 451–52 (N.D.Ohio 1987) (no showing that civil penalty was sought "because of property damage" to environment).

VI. *The Duty to Defend Question.*

As to this issue the policy language provides:

[The insurer] shall have the right and duty to defend any suit against the insured seeking *damages on account of ... property damage,* even if any of the allegations of the suit are groundless, false or fraudulent and may make such investigation and settlement of any claim or *suit* as [it] deems expedient....

(Emphasis added.)

The federal district court has asked us whether, based on this language, the insurer had any duty to defend A.Y. McDonald during the proceedings before the EPA. More specifically, that court has asked whether the proceedings before the EPA constituted a "suit."

We have already decided adversely to the defendants the predicate to a duty to defend: any action "against the insured seeking damages on account of property damage." Our remaining task is to interpret the meaning of the term "suit."

 In determining a duty to defend issue, we follow certain well-defined principles. An insurer's duty to defend is separate from its duty to indemnify; the duty to defend is broader than the duty to indemnify. *First Newton Nat'l Bank v. General Cas. Co.,* 426 N.W.2d 618, 630 (Iowa 1988); *McAndrews v. Farm Bureau Mut. Ins. Co.,* 349 N.W.2d 117, 119 (Iowa 1984). The duty to defend arises "whenever there is potential or possible liability to indemnify the insured based on the facts appearing at the outset of the case." *First Newton Nat'l Bank,* 426 N.W.2d at 623.

In other words, the duty to defend rests solely on whether the petition contains any allegations that arguably or potentially bring the action within the policy coverage. 7C J. Appleman, *Insurance Law and Practice* § 4684 at 83–85 (Berdal ed. 1979). If any claim alleged against the insured can rationally be said to fall within such coverage, the insurer must defend the entire action. *First Newton Nat'l Bank,* 426 N.W.2d at 630. In case of doubt as to whether the petition alleges a claim that is covered by the policy, the doubt is resolved in favor of the insured. *Id.* at 628.

The defendants and the amici who join them on this issue point out that the EPA has filed no action against A.Y. McDonald in a court of law. Until that happens, they argue, a duty to defend a "suit against the insured seeking damages" has not yet been triggered.

The policies do not define "suit." So we apply the same principles of interpretation we applied in interpreting "damages."

The dictionary gives "suit" a meaning the defendants seek: "an action or process in a court for the recovery of a right or claim." Webster's Third New International Dictionary 2286 (P. Gove ed. 1961). It also gives the word a second, broader meaning: "the attempt to gain an end by a legal process." *Id.*

Adopting the broader meaning, some courts have rejected the argument that the duty to defend arises only after the insured is the subject of a court action.[9]

9. *See, e.g., Avondale Indus., Inc.,* 887 F.2d at 1206 (state administrative proceeding initiated against insureds alleging violation of pollution laws held to be a "suit" under CGL policy); *Upjohn Co.,* 768 F.Supp. at 1197 ("'suit' [in CGL policy] includes any effort to impose on the policyholders a liability ultimately enforceable by a court") (no duty to defend where EPA only sent insured a "potentially responsible party" (PRP) letter and only required plaintiff to furnish certain information); *Higgins Indus., Inc. v. Fireman's Fund Ins. Co.,* 730 F.Supp. 774, 775–76 (E.D.Mich.1989) (demand letter from state environmental protection agency to insured ordering insured to cease unpermitted discharge of hazardous waste and warning insured that failure to comply "will result in further enforcement action" held to trigger duty to defend under CGL policy) ("insurance companies must defend governmental claims and demands in the environmental context, irrespective of whether those claims are couched in demand letters, administrative procedures, or in formal suits, until it is factually established that the policies do not apply"); *Ryan, Klimek, Ryan Partnership v. Royal Ins. Co.,* 728 F.Supp. 862, 867–68 (D.R.I.) (letters from state environmental protection agency *requesting* insureds submit a work plan and remedial cleanup plan did not constitute "suit" under CGL policy) (court inferred holding would be otherwise if letter had risen to level of coercive, adversarial demands), *aff'd,* 916 F.2d 731 (1st Cir.1990); *Ray Indus., Inc. v. Liberty Mut. Ins. Co.,* 728 F.Supp. 1310, 1313–14, 1311 (E.D.Mich.1989) (PRP letter from EPA to insured stating it considered insured a potentially responsible party for hazardous contamination and that agency intended to hold insured liable for at least $37 million in cleanup

On the other hand, several courts have opted for the first meaning: "an action or process in a court for the recovery of a right or claim."[10]

■ Because we see an ambiguity in the meaning of the term "suit," we join the majority of courts that adopt the broader meaning of the term. We hold that a "suit" under the policies here includes any attempt to gain an end by legal process. *See* Webster's Third New International Dictionary 2286 (P.Gove ed. 1961); *C.D. Spangler Constr. Co.*, 326 N.C. at 154, 388 S.E.2d at 570. We agree with the following:

[T]he EPA processes for the enforcement of obligations to aid in the cleaning up of environmental pollution have moved away from the use of lawsuits toward the use of agency demands for participation in remedial action. Those requests are dangerous for the alleged polluter to ignore because they often result in dispositive, extrajudicial solutions. The consequences of the receipt of [an] EPA [demand] letter [are] so substantially equivalent to the commencement of a lawsuit that a duty to defend [arises] immediately.

*Hazen Paper Co.*, 407 Mass. at 695–96, 555 N.E.2d at 581.

The EPA demand letter is not the same as a conventional demand letter based on a personal injury claim. The identification of an insured as a "potentially responsible party" (PRP) has more serious consequences than a demand letter in a personal injury case. For example, the insured can

costs triggered duty to defend under CGL policy); *Detrex Chem. Indus., Inc. v. Employers Ins. of Wausau*, 681 F.Supp. 438, 452–55 (N.D.Ohio 1987) (letter from state environmental protection agency to insured constituted "suit" under CGL policy because it invoked a statutory right to an adjudicatory hearing subject to administrative review); *New Castle County*, 673 F.Supp. at 1366 (duty to defend under CGL policy triggered by state environmental agency's action requiring county to take specific action); *Fireman's Fund Ins. Cos.*, 662 F.Supp. at 74–75 (duty to defend under CGL policy "does not hinge on the form of action taken or the nature of relief sought, but on an actual or threatened use of legal process to coerce payment or conduct by a policyholder," and " 'suit' includes any effort to impose on the policyholders a liability ultimately enforceable by a court") (PRP letter from EPA notifying insureds that the agency considered them potentially responsible for contamination of sixteen sites held sufficient to trigger duty to defend under CGL policies); *Hazen Paper Co.*, 407 Mass. at 693–97, 555 N.E.2d at 579–82 (PRP letter to insured from EPA regarding environmental cleanup was analogous to commencement of "suit" within meaning of CGL policy triggering duty to defend); *Polkow v. Citizens Ins. Co. of Am.*, 180 Mich.App. 651, 657, 447 N.W.2d 853, 855–56 (1989) (letter from state environmental protection agency to insured requiring insured to investigate and remedy environmental contamination triggered insurer's duty to defend under CGL policy) ("In our view, subjecting the insured to administrative mechanisms mandating an environmental investigation and cleanup, backed by the power to expose the insured to a money judgment in a court of law, amounts to a 'suit' for purposes of invoking the coverage of the policy."); *United States Aviex Co.*, 125 Mich.

App. at 585, 336 N.W.2d at 841 (threats of legal action from state environmental protection agency were sufficient to trigger duty to defend under CGL policy); *C.D. Spangler Constr. Co.*, 326 N.C. at 154, 388 S.E.2d at 570 (court chose broader meaning of word "suit": "attempt to gain an end by legal process") (held that compliance orders from state environmental protection agency to insured directing insured to clean up its sites triggered duty to defend under CGL policy).

10. *See, e.g., Arco Indus. Corp. v. Travelers Ins. Co.*, 730 F.Supp. 59, 65–69 (W.D.Mich.1989) (PRP letter from EPA to insured requesting certain information did not constitute "suit" within meaning of CGL policy) (question whether insurer would be obligated to defend in an action to enforce an administrative order or a suit to enter a consent decree left open); *Aetna Cas. & Sur. Co. v. Gulf Resources & Chem. Corp.*, 709 F.Supp. 958, 960 (D.Idaho 1989) (EPA's actions in conducting extensive studies to determine appropriate actions to clean up contaminated site not a "suit" within meaning of CGL policy) (suit limited to civil litigation, not administrative claims or proceedings); *Patrons Oxford Mut. Ins. Co.*, 573 A.2d at 20 (apparently limiting duty to defend to suit for damages); *Technicon Elecs. Corp. v. American Home Assurance Co.*, 141 A.D.2d 124, 145–46, 533 N.Y.S.2d 91, 104–05 (1988) (PRP letter from EPA to insured informing insured of potential liability under CERCLA and that EPA was interested in discussing insured's participation in remedial measures did not constitute "suit" under CGL policy) (intimated some court action is necessary to trigger duty to defend), *aff'd on other grounds*, 74 N.Y.2d 66, 76, 544 N.Y.S.2d 531, 534, 542 N.E.2d 1048, 1051 (1989) (holding that court need not decide whether EPA demand letter constituted "suit" within meaning of policy).

be fined for failure to cooperate in the EPA's process of cleanup. In addition, if the EPA ultimately recovers the costs of cleanup, the insured's failure to settle before any legal action by the EPA could increase the amount of recovery against the insured. *Id.* at 696, 555 N.E.2d at 581.

The insured's obligation

to respond positively to the [EPA's demand] letter [is] strong. The prospects of avoiding financial responsibility [are] minimal because liability is not based on fault. [*See* CERCLA, 42 U.S.C.] § 9607(a) (1982 & Supp.V.1987) and the available defenses are very limited. [*See* CERCLA, 42 U.S.C.] § 9607(b). Moreover, the risk to which [the insured is] exposed [is] substantial because, as a practical matter, its liability is joint and several. Early involvement in the settlement discussions is thus often crucial to protect one's interests. Any court action by EPA is limited to the administrative record [*see* CERCLA, 42 U.S.C.] § 9613(j)(1) (1982 & Supp. V 1987), and judicial review considers only whether the EPA "decision was arbitrary and capricious or otherwise not in accordance with law." [*See* CERCLA, 42 U.S.C.] § 9613(j)(2). Thus participation in the development of that record can be crucial. Settlement of EPA claims against potentially responsible parties, with protection against claims for contribution, is a desired goal. [*See* CERCLA, 42 U.S.C.] §§ 9613(f)(2), 9622(d). The situation [is] such that the opportunity to protect [the insured's] interests could well [be] lost, long before any lawsuit would be brought. It would be naive to characterize [an] EPA [demand] letter as a request for voluntary action. [The insured has] no practical choice other than to respond actively to the letter.

*Id.* at 696–97, 555 N.E.2d at 581–82 (some citations omitted).

■ Here the EPA's actions went far beyond a PRP demand letter. The EPA served A.Y. McDonald with a complaint, compliance order, and notice of opportunity for hearing. A.Y. McDonald was involved in a hearing and an appeal. A final decision found A.Y. McDonald guilty of certain violations of the RCRA, imposed a civil penalty, and ordered A.Y. McDonald to take remedial action. About a month later the EPA secured a consent order from A.Y. McDonald in which the company was required to take substantial remedial action. That consent decree order was filed in the United States district court. These actions went far beyond those found to constitute a suit in the cases cited. In our view these actions easily fit our adopted definition of "suit": any attempt to gain an end by legal process. The administrative process pursued by the EPA which culminated in the consent order filed in federal district court was an attempt on the part of the government to "gain an end by legal process." *Cf. C.D. Spangler Constr. Co.*, 326 N.C. at 154, 388 S.E.2d at 570 (compliance orders issued by state environmental protection agency held to constitute an attempt on the part of the state to "gain an end by legal process" and therefore covered by the term "suit" in a CGL policy).

## VII. *Disposition.*

Our answer to the first and second certified questions is that the term "damages" in the policies includes the government mandated response costs under CERCLA but not the penalty imposed.[11] The federal district court will need to determine whether such costs were necessary "because of property damage."

Our answer to the third certified question is that the proceedings before the EPA constituted a "suit" within the meaning of the Insurance Company of North America policy. So Insurance Company of North

---

11. Our conclusion applies to the policies covering "ultimate net loss" as described in the second certified question. The term "ultimate net loss" is defined in these policies as "the total sum which the insured ... becomes legally obligated to pay as damages, because of ... property damage ... and shall also include [a series of specified costs]." The parties do not dispute, and we hold, that at a minimum the term "damages" under the ultimate net loss definition has the same meaning as "damages" under the policies in the first certified question. *Cf. AIU Ins. Co.*, 51 Cal.3d at 842, 799 P.2d at 1278 n. 19, 274 Cal.Rptr. at 845.

America did have a duty to defend A.Y. McDonald during those proceedings.

We render no opinion on what legal effect the exclusion provisions of the CGL policies may have on the defendants' duty to indemnify and defend A.Y. McDonald. The meaning and legal effect of the exclusion provisions are issues that are not before us.

CERTIFIED QUESTIONS ANSWERED.