**HOFCO, INC., Appellant,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,**
**Appellee.**

**90–1801.**

Supreme Court of Iowa.

March 18, 1992.

Rehearing Denied April 17, 1992.

Thomas W. Andrews of Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, for appellant.

W. Don Brittin, Jr. and Hayward L. Draper of Nyemaster, Goode, McLaughlin, Voigts, West, Hansell & O'Brien, P.C., Des Moines, for appellee.

Considered by HARRIS, P.J., and LARSON, LAVORATO, NEUMAN, and ANDREASEN, JJ.

LAVORATO, Justice.

The issue here is whether a liability insurance policy covers an excise tax levied

against an employer because of a transaction between the employer and its employee profit sharing plan and trust. Because we think the "tax" is a penalty and therefore not a loss as defined by the policy, we affirm the district court's grant of summary judgment to the insurer.

## I. *Factual Background.*

The following undisputed facts are gleaned from the summary judgment record.

In 1979 James Wieder purchased all the stock of Hofco from the Hockenberg family and became the company's president, chairman of the board of directors, and sole stockholder. Hofco was a holding company, owning four smaller Hockenberg companies that sold and installed restaurant equipment and supplies. Wieder financed the purchase in part by a promissory note to the Hockenberg family, payable in yearly installments of approximately $400,000. These payments were secured by letters of credit from Iowa–Des Moines National Bank.

Wieder and his wife became cotrustees of the Hockenberg companies employees' profit sharing plan and trust (plan). The beneficiaries of the plan were employees or former employees of Hofco or the Hockenberg companies. Hofco was a sponsor of the plan but was never a trustee of it.

Eventually Wieder hired an insurance consultant to advise him—as president of Hofco—concerning appropriate insurance coverage for the company. Hofco settled on a pension trust liability policy purchased from National Union Fire Insurance Company of Pittsburgh, Pennsylvania. The policy coverage started on February 1, 1982, and ended February 1, 1985.

In 1982 Hofco developed financial problems and experienced significant losses. In January 1983, as the yearly payment on the promissory note to the Hockenbergs was approaching, Iowa–Des Moines told Wieder it had concerns about Hofco's cash flow and ability to make the payment. So the bank told Hofco it would extend it no further credit and asked Hofco to liquidate the companies.

Late in January 1983, Wieder submitted unaudited financial statements to United Central Bank and obtained new financing from that bank. United Central, however, required infusion of $400,000 of new capital into Hofco as a condition for the new financing. Wieder was able to raise $100,000 of this amount on his own. And on February 1, Wieder obtained the remaining $300,000 by selling 10,000 shares of Hofco stock to the plan for that amount of money.

As part of the stock transaction, Hofco gave the plan "put" options evidenced by a promissory note. (A "put" is an option permitting the holder to sell a certain stock or commodity at a fixed price for a stated quantity and within a stated period. Black's Law Dictionary 1112 (5th ed. 1979).) The note was secured by a second mortgage to the plan on Hofco's office building in Des Moines. Hofco and the plan's trustees signed the mortgage.

Wieder and his wife acted as trustees for the plan in purchasing the stock. Wieder also acted on behalf of Hofco as its president. Wieder maintains the transaction was conducted on the advice of his lawyers.

In April, United Central received the preliminary report of Hofco's financial condition for the fiscal year ending January 31, 1983. The audit report disclosed discrepancies from the unaudited information Wieder had previously provided. The audit report prompted United Central to withdraw its financing of Hofco. As a result, Hofco was forced to liquidate its business.

In May, Hofco—again allegedly on the advice of counsel—repurchased the stock it had previously sold the plan. The purchase price was $309,375 and payment was by a promissory note to the plan. The note provided for interest payments only until February 1, 1987; beginning March 1, 1987, principal payments were to begin. The principal payments were on a fixed, fifteen-year monthly schedule. The promissory note was secured by a different second mortgage on Hofco's office building in Des Moines.

Only a few interest payments on the note were made. None of the principal payments were made.

By December Hofco ceased doing business although the corporation was never formally dissolved. The promissory note held by the plan proved worthless. Payment of the $1 million first mortgage on Hofco's office building devoured the equity Hofco had in the building and deprived the plan beneficiaries of any recoupment.

By now the Wieders and Hofco enjoyed a high profile. Two federal lawsuits and an internal revenue investigation resulted.

On April 17, 1985, several of the largest beneficiaries of the plan sued the Wieders. They alleged that the Wieders had breached their fiduciary duties to the plan as trustees when they engaged in the stock sale-and-buy-back transactions. The Wieders' lawyers were also named as defendants for their alleged advice to the Wieders in their capacity as trustees.

The following month, the United States department of labor sued the Wieders in their capacity as plan trustees. The department alleged that the Wieders had violated several provisions of the Employee Retirement Income Security Act of 1974 (ERISA). *See* 29 U.S.C. §§ 1001–1461 (1982). Four specific violations of ERISA were alleged: (1) breach of fiduciary duties to act prudently and solely in the interest of the beneficiaries of the plan, (2) engaging in the prohibited sale of stock between the plan and a party in interest (Hofco), (3) causing the plan to extend credit to a party in interest (Hofco), and (4) dealing with the plan's assets in the Wieders' personal interest.

The two cases were eventually consolidated. They sought damages for the losses suffered by the plan from (1) the stock transactions with Hofco, and (2) the failure of Hofco to pay the promissory note to the plan.

Litigation ceased on April 25, 1988, when a consent order was entered in the consolidated action. The order decreed that $260,000 was to be paid to a settlement administrator who would then distribute that fund to the plan beneficiaries. National Union paid one-half of the settlement and the malpractice carrier for the Wieders' lawyers paid the other half. The plan was then liquidated and dissolved.

In addition to its payment of one-half the settlement, National Union paid all legal fees the Wieders had incurred in defending against the two lawsuits. The settlement and fee payments were made under the pension trust liability policy that Hofco had purchased from National Union.

At this juncture the IRS began an investigation of Hofco for its stock transactions with the plan. The IRS ultimately determined that these were prohibited transactions under 26 U.S.C. § 4975. Prohibited transactions under this section include: (1) the sale of property by an employer to its profit sharing plan, and (2) the loaning of money or the extension of credit by the profit sharing plan to the employer company.

In September 1988, under section 4975(a), the IRS assessed $39,474.72 in excise taxes against Hofco for tax years ending January 31, 1984, through January 31, 1988. Hofco asked National Union to reimburse it for legal expenses, costs, and taxes in connection with the IRS excise tax assessment. National Union refused, claiming the excise tax levied against Hofco was not covered by the policy.

In November 1989 Hofco agreed to the IRS excise tax assessment in the amount of $24,474.42. Unbeknownst to National Union, Hofco subsequently settled its claim against its lawyers for the excise tax. The lawyers paid $18,000 in return for a release of liability from the claim.

Hofco then pressed National Union again for reimbursement of the full amount of the IRS assessment and all attorney fees and costs incurred in the tax dispute. National Union again refused to pay. National Union finally learned of Hofco's $18,000 settlement with its attorneys in January 1990.

## II. *Procedural Background.*

In February 1990 Hofco filed the present suit seeking indemnification from National

Union for the excise tax, attorney fees, and costs under the terms of the policy. Hofco moved for partial summary judgment. Later National Union moved for summary judgment. After a hearing on the motions, the district court denied Hofco's motion and granted National Union's.

### III. *Scope of Review.*

Our review of summary judgment is at law. Iowa R.App.P. 4. Summary judgment is proper under Iowa Rule of Civil Procedure 237 only when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. *Colton v. Branstad,* 372 N.W.2d 184, 187 (Iowa 1985).

The party moving for summary judgment has the burden of showing the nonexistence of a genuine issue of material fact. *First Nat'l Bank v. Kenny,* 454 N.W.2d 589, 591 (Iowa 1990). The party resisting should be afforded every legitimate inference that can reasonably be deduced from the evidence. *Northrup v. Farmland Indus., Inc.,* 372 N.W.2d 193, 195 (Iowa 1985). A fact question is generated if reasonable minds can differ on how the issue should be resolved. *Id.* There is no fact question if the only conflict concerns legal consequences flowing from undisputed facts. *Brown v. Monticello State Bank,* 360 N.W.2d 81, 84 (Iowa 1984). In those circumstances, summary judgment is proper. *Jacobs v. Stover,* 243 N.W.2d 642, 643 (Iowa 1976).

Here the facts are not in dispute. The only question to resolve then is whether the law was correctly applied on the coverage issue.

### IV. *The Coverage Issue.*

■ Although the parties argue several theories to support their respective positions on the coverage issue, we need only address one because it is dispositive. For reasons that follow we agree with National Union that the excise tax is a penalty and is therefore not a "loss" covered by the policy.

A. *The policy language.* The pertinent language of the policy provides:

#### *Insurance Agreement*

1. *Pension Trust Liability.* To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as loss because of any breach of fiduciary duty ... by any other person for whom the insured is legally responsible and arising solely out of the insured's capacity as a fiduciary (as defined in the Employee Retirement Income Security Act of 1974) of any plan named in item 1(a) of the ·declarations.

. . . .

3. The term "loss," shall mean the amount which the insured is legally obligated to pay as damages arising from judgments or settlements of any claim or claims made against it for breach of fiduciary duty, as herein defined, and shall include defense costs, charges and expenses ... *provided always that such subject of loss shall not include fines or penalties imposed by law....*

4. The term "breach of fiduciary duty" shall mean the violation of any of the responsibilities, obligations or duties imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974 or amendments thereto....

(Emphasis added.)

B. *Controlling ERISA language.* As to the excise tax assessed against Hofco, 26 U.S.C. § 4975(a) states:

There is hereby imposed a tax on each *prohibited transaction.* The rate of tax shall be equal to five percent of the amount involved with respect to the prohibited transaction for each year (or part thereof) in the taxable period. The tax imposed by this subsection shall be paid by *any disqualified person who participates in the prohibited transaction* (other than a fiduciary acting only as such).

(Emphasis added.)

Section 4975(b) provides an additional tax of 100% of the amount involved if the

transaction is not corrected within the taxable period. No amount was assessed against Hofco under this provision.

A "prohibited transaction" includes any "*sale or exchange of any property between a plan and a disqualified person....*" 26 U.S.C. § 4975(c) (emphasis added). A "disqualified person" includes, among others, *an employer whose employees are covered by the plan.* 26 U.S.C. § 4975(e)(2) (emphasis added).

C. *The issue.* There is no dispute that Hofco violated 26 U.S.C. § 4975(a) when it sold its stock to the plan. The plan covered employees of Hofco. And Hofco, a disqualified person, sold property to its plan.

The issue is whether the five percent excise tax is a "penalty" within the meaning of the term "loss" in section 3 of the policy.

■ D. *Principles of construction.* Construction or interpretation of an insurance policy—determining its legal effect—is a question of law for the court. *A.Y. McDonald Indus., Inc. v. Insurance Co. of N. Am.,* 475 N.W.2d 607, 618 (Iowa 1991). In construction or interpretation questions, the cardinal principle is that the intent of the parties controls. *Id.* Except in cases of ambiguity, intent is determined by what the policy itself says. *Id.;* Iowa R.App.P. 14(f)(14).

■ Words left undefined in a policy should be given their ordinary meaning, one which a reasonable person would understand them to mean. And in searching for the ordinary meaning of undefined terms in a policy, we commonly refer to dictionaries. *A.Y. McDonald,* 475 N.W.2d at 619.

E. *Analysis.* Though the word "penalty" is not defined in the policy, we find that it is not ambiguous. Its dictionary meaning is the one that is commonly understood.

"Penalty" is defined this way:

[a] A penalty is a sum of money which the law exacts payment of by way of punishment for doing some act which is prohibited or for not doing some act which is required to be done.

Black's Law Dictionary 1020 (5th ed. 1979); *see also United States v. LaFranca,* 282 U.S. 568, 572, 51 S.Ct. 278, 280, 75 L.Ed. 551, 555 (1931) (similarly defining a penalty as "an exaction imposed by statute as punishment for an unlawful act"). We apply the dictionary definition to the word "penalty" in the policy here.

"Tax" is defined as

[a] pecuniary burden laid upon individuals or property to support the government.

Black's Law Dictionary 1307 (5th ed. 1979); *see also LaFranca,* 282 U.S. at 572, 51 S.Ct. at 280, 75 L.Ed. at 555 (similarly defining a tax as "an enforced contribution to provide for the support of government").

What is not clear is whether the excise "tax" is really a tax or a penalty. Our answer to this question depends on statutory construction principles, the primary one of which is what Congress intended in the case of the excise tax. In searching for that intention, we may consider—among other things—the statute's legislative history and what Congress sought to accomplish by the statute. *In re Graven,* 936 F.2d 378, 385 (8th Cir.1991).

As to the legislative history and purpose of the section 4975 excise tax, one court noted:

Section 503 was amended by ERISA so that, in general, it no longer applies to qualified plans, and the kind of conduct theretofore the target of section 503 became subject to *graduated penalties* in the form of excise taxes under section 4975. The prohibited transaction taxes are imposed on any "disqualified person" who participates in the transaction. The congressional intent underlying the change in sanctions is expressed as follows:

Under present law, if a prohibited transaction occurs, a plan (and trust) loses its exemption from taxation. If a trust is disqualified because of an act of the trustee and the employer, then the income tax imposed on the trust may be paid out of funds otherwise available to provide employees' retire-

ment benefits and the *sanction* may then fall on innocent employees. To correct this problem in the future, the substitute eliminates disqualification and instead would impose an *excise tax sanction* for a violation of the prohibited transactions provisions. H.R.Rep. No. 1280, 93rd Cong., 2nd Sess., at 322 (1974).

*Winger's Dep't Store, Inc. v. Commissioner,* 82 T.C. 869, 885 (1984) (emphasis added).

The House report language cited in *Winger's* makes it clear that the excise tax statute was passed to shift the sanction for a violation of the prohibited transaction provision from the trust or plan to the parties responsible for the transaction. Significantly, the House report speaks in terms of an "excise tax sanction." The word "sanction" is commonly understood to mean "[t]hat part of a law which is designed to secure enforcement by imposing a *penalty* for its violation." Black's Law Dictionary 1203 (5th ed. 1979) (emphasis added).

One commentator makes a convincing argument that the excise tax here is penal in nature:

> Under I.R.C. section 4975(a), (b), the initial tax on the disqualified person is 5% of the amount involved, with a follow-up tax of 100% if the transaction is not corrected. The tax is purely penal; it cannot seriously be argued that the tax is designed to raise revenue. Total revenue raised by the section 4975 excise tax on 1.3 million pension plans in fiscal 1977 was $140,000. In fiscal 1978, on 1.9 million pension plans, only $194,000 was collected.

Note, *ERISA's Prohibited Transactions,* 4 J.Corp.Law, 377, 396, n. 166 (1979) (citation omitted).

Several cases dealing with tax legislation involving private foundations provide persuasive authority for our conclusion that the substantial purpose of the excise tax here is to penalize rather than to raise revenue. *See, e.g., In re Kline,* 403 F.Supp. 974 (D.Md.1975), *aff'd per curiam,* 547 F.2d 823 (1977). In *Kline* the issue

was whether excise taxes imposed under 26 U.S.C. § 4941(a)(1) and (b) were taxes or penalties for purposes of section 57(j) of the Bankruptcy Act, 11 U.S.C. § 93(j) (1970). Under section 57(j) debts owing to the United States that constitute penalties are not allowed as claims in a bankrupt estate. In *Kline* the court disallowed a government claim for excise taxes imposed under section 4941(a)(1) and (b), concluding that the excise taxes were penalties. The case is important for our purposes because 26 U.S.C. § 4941(a)(1) and (b) are analogous to 26 U.S.C. § 4975(a) and (b), the excise tax provisions here.

*Kline* points out that the Tax Reform Act of 1969 "dealt in part with abuses which had arisen in connection with private foundations, including self-dealing between foundations and their respective founders, contributors, officers, directors, and others." *Kline,* 403 F.Supp. at 976. Under the 1969 Act, Congress enacted a number of provisions to take the place of the then existing provisions of 26 U.S.C. §§ 503 and 504. Sections 503 and 504 imposed sanctions for violating rules against taxpayer transactions involving foundations. Those sanctions included loss of the foundation's tax exempt status if it engaged in a "prohibited transaction" defined in section 503(c). Charitable contributions were also disallowed. *See* 26 U.S.C. § 503(e) (1964). The 1969 amendments superseded sections 503 and 504 by imposing a five percent excise tax on the amount involved on a "disqualified person" in each act of self-dealing. *See* 26 U.S.C. §§ 4941(a)(1), 4946(a), 4941(d) (1982). The amendments also imposed additional taxes on the disqualified person if the act of self-dealing is not corrected within a stated period of time. The tax is 200% of the amount involved if the disqualified person is not a foundation manager and 50% if the person is. *See* 26 U.S.C. § 4941(b).

The court in *Kline* cited legislative history to support its conclusion, a House report which stated:

> In order to minimize the need to apply subjective arm's-length standards, to avoid the temptation to misuse private

foundations for non-charitable purposes, to provide a more rational relationship between sanctions and improper acts, and to make it more practical to properly enforce the law, your committee has determined to generally prohibit self-dealing transactions and to provide a variety and graduation of sanctions, as described below.

*Kline*, 403 F.Supp. at 978 (citing 2 U.S.Code Cong. & Admin.News 1665). The House report noted that the punitive purpose "is made even more clear by the graduated levels of the sanctions." *Id.* The court also noted that had Congress intended

> that the new provisions compensate the government for revenue lost because of the abuses, the graduated levels would have approximated or at least have borne some relation to the amount of revenue lost by such conduct. Neither report contains an estimate of the revenue expected to result from the proposed amendments. Such an estimate is ordinarily included in the reports, and was included with respect to most if not all other provisions of the Tax Reform Act. The absence of such an estimate is another point in favor of treating the exactions under [section 4941] as penalties rather than taxes.

*Id.*

The court rejected arguments that Congress had used the word "penalty" in other statutes so it knew how to impose a penalty when it intended to do so. *Id.* It also rejected the argument that the name—excise tax—used by Congress was conclusive, citing authority to the contrary. *Id.* Finally, the court contrasted a measure designed to punish conduct perceived as wrongful from one designed primarily to raise revenue, characterizing the former as a penalty and the latter as a tax measure. *Id.*

In a subsequent per curiam opinion the fourth circuit court of appeals affirmed the district court's decision in *Kline* and adopted the district court's opinion as its own. *See In re Kline*, 547 F.2d 823 (4th Cir.1977) (per curiam).

We think, for three reasons, the court's analysis in *Kline* applies equally as well to the excise tax involved here. First, according to legislative history, the substantial purpose of the section 4941 and 4975 taxes is to prohibit certain conduct, not to raise revenue. Second, Congress has attempted to accomplish this purpose by imposing a tax on the individuals involved in the prohibited transactions. Last, unless the wrong is undone, the tax increases to almost confiscatory rates. As one court noted:

> The language of the Act, its legislative history, the graduated levels of the sanctions imposed, and the almost confiscatory level of the exactions assessed, convince us that the exactions in question were intended to curb the described conduct through pecuniary punishment.

*In re Unified Control Systems, Inc.*, 586 F.2d 1036, 1039 (5th Cir.1978) (following *Kline* on the issue whether section 4941 imposes a penalty). *See also Farrell v. United States*, 484 F.Supp. 1097, 1098–99 (E.D.Ark.1980) (following *Kline* and *Unified Control* and concluding section 4941(a) imposes a penalty for all purposes including calculation of interest on assessment because section 4941(a) has all of the characteristics of a penalty except the use of the word "tax" in its language, which by itself is not controlling).

Two federal circuits have addressed the question whether the excise tax assessment under 26 U.S.C. § 4975 is a penalty or a tax: *Latterman v. United States*, 872 F.2d 564 (3rd Cir.1989) and *Nieto v. Ecker*, 845 F.2d 868 (9th Cir.1988).

*Latterman* refused to follow *Kline* and *Unified Control* on the issue whether interest under 26 U.S.C. § 6601 on an excise tax assessment under section 4975 is a penalty or tax. *Latterman*, 872 F.2d at 570. Section 6601(a) provides that interest begins to accrue on unpaid "taxes" on the "last date prescribed for payment." 26 U.S.C. § 6601(a). Section 6601(e)(2) provides that when an amount is an "assessable penalty, additional amount, or addition to the tax," interest does not begin to accrue until ten days after the IRS issues a

notice and demand for the unpaid amount. 26 U.S.C. § 6601(e)(2). Relying heavily on Congress' use of the word "tax" in section 4975, the court in *Latterman* concluded that the amount under section 4975 was a "tax" rather than a "penalty." *Latterman*, 872 F.2d at 568–69. The key to the court's holding was its conclusion that "[t]he relevant inquiry under section 6601 is *when* interest begins to accrue, and that inquiry has nothing to do with the *purpose* of an assessment but rather with the *timing* of its due date." *Id.* at 569.

In *Nieto* the court held that although the tax levied under section 4975 was a civil penalty, that fact does not foreclose a remedial action by the secretary of labor or by trust participants or beneficiaries against disqualified persons who participate in prohibited transactions. *Nieto*, 845 F.2d at 874 n. 6; *accord Wood v. Commissioner*, 95 T.C. 364, 372 (1990), *rev'd on other grounds*, 955 F.2d 908 (4th Cir.1992).

We adopt the reasoning of *Kline* and *Unified Control* because we find that reasoning more persuasive than the hypertechnical reliance on verbiage in *Latterman*.

### V. *Disposition.*

Because we hold that the assessment under section 4975 is a "penalty" rather than a "tax," we conclude the policy here affords no coverage for the section 4975 assessment against Hofco. So we affirm the summary judgment ruling that reached the same conclusion.

AFFIRMED.