**GRINNELL MUTUAL REINSURANCE COMPANY, Appellant,**

v.

**Henry C. JUNGLING, Jr., and Jungling Farms, Inc., Appellees.**

No. 00–1474.

Supreme Court of Iowa.

Dec. 18, 2002.

Douglas A. Haag of Patterson, Lorentzen, Duffield, Timmons, Irish, Becker & Ordway, L.L.P., Des Moines, for appellant.

H. Richard Smith and David Swinton of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., Des Moines, for appellees.

LAVORATO, Chief Justice.

Grinnell Mutual Reinsurance Company (Grinnell) appealed from a district court declaratory ruling that the company was obligated to indemnify its insured, Henry C. Jungling, Jr., under a personal excess liability policy for a settlement payment Jungling's corporation made in a fraud suit against Jungling and his corporation. Grinnell contended that the district court erred in concluding that (1) the terms of the policy provided coverage, (2) public policy did not bar coverage, (3) Jungling was legally excused from complying with the notice provisions of the policy, and (4) Grinnell was obligated to fully indemnify Jungling.

We transferred the case to the court of appeals, which reversed, concluding that public policy barred coverage. On further review, we vacate the court of appeals decision, affirm in part and reverse in part the district court judgment, and remand the case with directions.

## I. Background Facts.

In February 1993, William J. Steckel and Natalie M. Steckel purchased a dairy farm in Butler County, Iowa from Jungling Farms, Inc. In January 1995, the Steckels sued Henry C. Jungling, Jr. and Jungling Farms, Inc., seeking compensatory and punitive damages. The suit alleged fraudulent misrepresentation and fraudulent nondisclosure (hereinafter "the Steckel suit").

On the date the Steckel suit was filed, Henry C. Jungling, Jr. owned a personal excess liability policy (excess policy) and underlying auto liability, recreational vehicle, and homeowners' policies, all issued by Grinnell. The excess policy was in force from January 1992 until January 1998. Jungling Farms, Inc. was an additional insured under the policy from January 1992 until January 1994 and then again after December 15, 1995.

A jury in the Steckel suit found Jungling and his corporation jointly and severally liable on the Steckels' fraudulent misrepresentation and fraudulent nondisclosure claims. The jury awarded the Steckels $323,300 in compensatory damages. The district court refused to submit the punitive damages claim to the jury. Jungling and the corporation appealed and the Steckels cross-appealed. We transferred the case to the court of appeals, which affirmed the compensatory damage award but reversed and remanded for trial on the punitive damages issue.

While the application for further review was pending in our court, the parties settled. Jungling and his corporation agreed to pay the Steckels $465,000 in settlement. Grinnell contributed $50,000 toward the settlement, without waiving its legal rights to address the issue of coverage later.

Following the settlement, Jungling made a demand pursuant to the terms of his

excess policy for payment of $344,400 (settlement amount of $465,000, minus Grinnell's $50,000 contribution, and minus $70,600 representing return of payments made by the Steckels on the contract of sale which were not part of the "loss" within the terms of the excess policy). Demand was also made for attorneys' fees and expenses incurred in defense and settlement of the Steckel suit.

## II. The Declaratory Judgment Action.

In July 1998, Grinnell filed a petition for declaratory judgment against Jungling and the corporation, asking the district court to declare that Grinnell was not required to pay any part of the $344,400 demand. Later, Grinnell and both defendants filed separate motions for summary judgment.

In its ruling on the motions for summary judgment, the district court found there were genuine issues of material fact on whether Jungling properly notified Grinnell of the Steckel suit, as required by the terms of the excess policy, and whether his alleged failure to give such notice prejudiced Grinnell.

Additionally, the court rejected Grinnell's argument that the excess policy could be construed to exclude intentional acts. The court also ruled that "public policy does not mandate that insurance companies not pay for the intentional acts of their insureds." The court concluded that the excess policy did provide coverage for the claims asserted in the underlying litigation and the losses incurred in settling the litigation, including compensatory and punitive damages.

Responding to Grinnell's Iowa Rule of Civil Procedure 1.904(2) (formerly rule 179(b)) motion, the district court concluded that the excess policy did not provide coverage for damages arising out of the intentional acts of the defendant corporation. The court reasoned that coverage for the corporation, an additional insured, was limited due to an intentional acts exclusion found in the underlying farm policy.

Later, the notice issues were tried to the court. Following a bench trial, the district court found that Jungling did not substantially comply with the notice provision of the excess policy. However, the court further found that Jungling proved his failure to comply was legally excused. Finally, the court found that Grinnell did not show that the delayed receipt of notice of the Steckel suit prejudiced it. The court therefore concluded that Grinnell was obligated to indemnify Jungling for the $344,400 demand plus attorney fees, interest and costs.

Grinnell appealed and we transferred the case to the court of appeals. Grinnell raised the following issues: (1) by the terms of the excess policy, Jungling's intentional and premeditated fraud was not covered; (2) it is contrary to public policy to require an insurer to pay a loss caused by the policyholder's fraud and deceit; (3) Jungling's noncompliance with the notice provisions of the excess policy was not legally excused and resulted in prejudice to Grinnell; and (4) Grinnell should not be required to fully indemnify Jungling because the settlement was paid by the defendant corporation, which the district court had previously determined was not covered under the terms of the excess policy.

The court of appeals reversed on public policy grounds. In view of this conclusion, the court of appeals concluded it was not necessary to address Grinnell's other issues and held that Grinnell was not obligated to reimburse Jungling for the $344,400 demand.

We granted Jungling's application for further review.

## III. Scope of Review.

■ The district court resolved the coverage and public policy issues in its ruling on the parties' motions for summary judgment. Our review of summary judgment rulings is at law. Iowa R.App. P. 6.4; *Hofco, Inc. v. National Union Fire Ins. Co. of Pittsburgh*, 482 N.W.2d 397, 400 (Iowa 1992).

■ Summary Judgment is appropriate under Iowa Rule of Civil Procedure 1.981 only when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. *Id.* A fact question arises if reasonable minds can differ on how the issue should be resolved. *Id.* No fact question arises if the only conflict concerns legal consequences flowing from undisputed facts. *Id.* Summary judgment is therefore appropriate in these circumstances. *Id.*

■ The district court addressed the notice-related issues in its ruling on the petition for declaratory judgment. Because the parties tried the case at law, our review is for correction of errors at law. *Pursell Constr., Inc. v. Hawkeye–Security Ins. Co.*, 596 N.W.2d 67, 69 (Iowa 1999).

■ On our review, we determine the sufficiency of the evidence in the light most favorable to the district court's findings whether or not the evidence was contradicted, and we will not weigh the evidence or pass on the credibility of the witnesses. *Beeck v. Aquaslide 'N' Dive Corp.*, 350 N.W.2d 149, 154 (Iowa 1984); *Henschel v. Hawkeye–Security Ins. Co.*, 178 N.W.2d 409, 415 (Iowa 1970). The court's findings are binding on us if substantial evidence supports those findings. *Beeck*, 350 N.W.2d at 154. Substantial evidence supports a finding of fact if one may reasonably infer the finding from the evidence. *Id.*

## IV. The Coverage Issue.

■ Grinnell first cites to the insuring clause of the excess policy to support its argument that the terms of the policy provide no liability coverage for Jungling's intentional acts. The language of that clause provides:

> We will pay on behalf of the insured person for loss in excess of the applicable underlying limits or retained limit which is from personal injury or property damage *occurring* during the policy period.

(Emphasis added.)

Then Grinnell points to the term "occurring," which it argues is a derivative of the term "occurrence." "Occurrence" is defined in the policy as follows:

> "Occurrence" *includes* all personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions.

(Emphasis added.)

Grinnell's argument proceeds as follows. Use of the term "includes," rather than "means," renders the definition a partial definition of the term "occurrence." Therefore, the court should look to the dictionary definition of the term to ascertain its "ordinary meaning." The dictionary meaning of "occurrence" is "any incident or accidental event" and "any incident or event, especially one that happens without being designed or expected." The New Webster's Dictionary 576 (1971). Because Jungling's fraudulent actions were by design, and not accidental, the loss is not one that resulted from an "occurrence" within the meaning of the excess policy.

"Construction of an insurance policy—the process of determining its legal effect—is a question of law for the court. Interpretation—the process of determining the meaning of words used—is also a question of law for the court unless it depends on extrinsic evidence or a choice among reasonable inferences to be drawn." *A.Y. McDonald Indus. v. Ins. Co. of N. Am.,* 475 N.W.2d 607, 618 (Iowa 1991). Regarding construction or interpretation questions, the cardinal principle is that the intent of the parties controls. *Id.* Unless the policy is ambiguous, we determine intent by what the policy says. *Id.* We interpret ambiguous policy provisions in favor of the insured because insurance policies are in the nature of adhesion contracts. *Id.* at 619.

In addition, when an insurer has affirmatively expressed coverage through broad promises, it assumes a duty to define any limitations or exclusionary clauses in clear and explicit terms. *Amco Ins. Co. v. Haht,* 490 N.W.2d 843, 845 (Iowa 1992). Also, we interpret a policy from the viewpoint of an ordinary person, not a specialist or expert. *Id.* So when words in a policy are not defined, we will not give such words a technical meaning. *A.Y. McDonald Indus.,* 475 N.W.2d at 619. Rather, we will give undefined words their ordinary meaning, one that a reasonable person would understand them to mean. *Id.*

We first note that the excess policy has no language clearly and expressly excluding coverage of losses arising from intentional acts. We agree with Jungling that Grinnell's "occurrence" argument is a strained attempt to get around the absence of such exclusionary language. In effect, Grinnell is saying that the language "occurring during the policy period" in the insuring clause has the same effect as an express exclusionary clause based on its suggested interpretation of "occurring" and "occurrence."

We likewise agree with Jungling that the word "occurrence" and "occurring" are actually derivatives of the word "occur." It would therefore make more sense to look to the dictionary meaning of the word "occur" for guidance as to the ordinary meaning of the word "occurring" in the insuring clause. The ordinary meaning of the word "occur" is "to happen; take place, come to pass," as for example, "When did the accident occur?" Webster's Encyclopedic Unabridged Dictionary 1340 (1996). An ordinary person reading the insuring clause would interpret the word "occurring" to plainly refer only to the timing of the loss because it appears as part of the phrase "occurring during the policy period."

In any event, we think the district court had it right when it reasoned as follows:

Although other words defined in the policy are followed by the words "means" (e.g., "business" *means* ...), "occurrence" is followed by the word "includes." An argument could be made that this distinguishes words that are expressly defined from words that are not so defined, but are understood to have a generally accepted meaning not set forth in the policy definition. The problem with that argument is the policy holder is not advised of the distinction. That is to say, the policy holder is not aware that the definition given is not the full definition. The insurer must be "clear and explicit" in its terms. Accordingly, it appears the insurer has not been explicit in defining the terms used in the policy. [Grinnell] failed to exclude intentional acts in its personal excess policy.

Moreover, we find it significant that the only ground that Grinnell relied on in denying coverage initially was a pollution

exclusion clause. Relatedly, a Grinnell staff attorney wrote in his notes the following regarding the Steckel case:

> A reservation of rights has been sent on the Personal Excess [Policy] due to the pollution exclusion. However, due to the lack of an intentional acts exclusion, the Personal Excess [Policy] appears to pick up coverage for the damages arising out of the misrepresentations and for the emotional distress alleged.

Suffice it to say, if Grinnell had intended to exclude intentional acts from the policy, it should have explicitly excluded them. Grinnell could easily have included an intentional-acts-exclusion provision in the excess policy.

## V. The Public Policy Issue.

As to this issue, Grinnell contended that in perpetrating the fraud on the Steckels, the two defendants committed theft by consumer fraud—a criminal act—in violation of Iowa Code section 714.16(2) (1995). Grinnell further contended that public policy bars insurance coverage for an insured's intentional and criminal acts. As mentioned, the court of appeals reversed on public policy grounds. The court of appeals reasoned that Jungling, by perpetrating a fraud on the Steckels, committed a criminal act of consumer fraud pursuant to Iowa Code section 714.16(2), an offense punishable as a simple misdemeanor under Iowa Code section 701.8. The court concluded that "it is contrary to public policy to provide insurance coverage for losses caused by Jungling's fraudulent misrepresentations."

Jungling contends, among other things, that the court of appeals erred in concluding that a violation of section 714.16(2) constitutes a criminal act. Additionally, Jungling contends the court of appeals erred in concluding that public policy precludes coverage of losses arising from intentional acts of any kind (not just criminal acts).

We address the public policy argument as it relates to both the criminal acts and the intentional acts.

**A. Criminal acts.** To the extent that the court of appeals concluded that the fraudulent acts were criminal acts in violation of Iowa Code section 714.16(2), the court erred. In *Molo Oil Co. v. River City Ford Truck Sales, Inc.,* 578 N.W.2d 222, 227–28 (Iowa 1998), we addressed whether a private cause of action exists under section 714.16(2)(a). After concluding section 714.16(2)(a) does not expressly create a private cause of action, we went on to determine "whether a violation of [the statute] amount[ed] to perpetration of a crime." *Id.* at 228. We concluded it did not because the statute did not provide punishment for its violation. *Id.* We therefore need not give any further consideration to whether the policy covers criminal acts.

**B. Intentional acts.** Regardless of whether Jungling's actions were criminal or violated a particular criminal statute, Grinnell contends public policy should bar insurance coverage for Jungling's intentional acts. As mentioned, the excess policy contains no intentional-acts exclusion. Therefore, the question is whether public policy demands the denial of coverage for Jungling's intentional acts in this case.

1. **The general rule and the emerging exception.** Historically, courts have held that it is contrary to public policy to insure against liability arising directly against the insured from intentional or willful wrongs. 7 Lee R. Russ, *Couch on Insurance 3d* § 101:22, at 101–79 (1997) [hereinafter *Couch* ]; *accord* 4 Eric Mills Holmes, *Holmes' Appleman on Insurance 2d* § 23.4, at 504 (1998) ("Public policy will not permit an insured to benefit from his

or her own intentional wrongdoing.") [hereinafter *Holmes* ]; *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 826 F.Supp. 155, 162 (E.D.Va.1993) ("[P]ublic policy generally bars coverage for an insured's intentional wrongdoing or criminal misconduct."); *St. Paul Ins. Co. v. Talladega Nursing Home, Inc.*, 606 F.2d 631, 633–34 (5th Cir.1979) (explaining that under Alabama law all contracts insuring against loss from intentional wrongs are void as against public policy).

Even when the policy "is silent as to intentional wrongs and merely states positive coverage in terms sufficiently broad to encompass intentional conduct, public policy generally requires that the policy be read as implicitly excluding coverage for intentional acts." *Couch* § 101:22, at 101–82; *accord Holmes* § 116.1, at 3 (2000) ("[E]ven if liability insurance policies did not contain [intentional-acts] exclusions or exceptions, the general rule is that an insured's intentionally caused harm to another would not be covered by a liability insurance policy.").

The court in *Jacobson* explained the rationale behind the public policy prohibition against coverage for intentional acts:

Underlying this public policy coverage bar is the concern that permitting coverage in certain circumstances will encourage insureds to engage in intentional misconduct. Barring coverage in these circumstances discourages insureds from intentionally harming others, as intentional wrongdoers cannot then rely on the availability of insurance to shield them from the civil consequences of their misconduct. Similarly, the public policy coverage exclusion bars insureds from recovering for self-inflicted wounds, thereby appropriately preventing insureds from enjoying the fruits of their wrongful acts.

*Jacobson*, 826 F.Supp. at 162–63; *see also Decorative Center of Houston v. Employers Cas. Co.*, 833 S.W.2d 257, 260 (Tex.Ct.App.1992) ("The rationale behind the public policy is that the insured is more likely to engage in behavior which is harmful to society if he believes that he will not have to bear the financial costs of his intentional indiscretions.").

Notwithstanding the general rule, "a growing number of modern cases find the insured's intentional and similar conduct not to bar liability insurance coverage." *Couch* § 101:24, at 101–84. According to *Couch*, "[t]he more lenient view apparently finds that the public interest in having victims recover for their injuries outweighs the public interest in forcing the willful wrongdoer to pay the consequences of the wrongdoing." *Id.* at 101–86; *see also Sch. Dist. For City of Royal Oak v. Continental Cas. Co.*, 912 F.2d 844, 849 (6th Cir.1990) (holding that Michigan's public policy did not void a school district's liability policy that provided coverage for damages arising out of insured's religious discrimination); *New Madrid County Reorganized Sch. Dist. No. 1 v. Continental Cas. Co.*, 904 F.2d 1236, 1242–43 (8th Cir.1990) (policy contained no intentional-acts exclusion; court rejected argument that Missouri's public policy forbids insurance coverage for an insured's intentional wrongful acts and held that policy covered civil rights violation which court concluded was covered under "wrongful acts" provision in the policy); *Jacobson*, 826 F.Supp. at 164–65 (medical malpractice policy contained no intentional-acts exclusion; court rejected argument that public policy barred recovery and recognized exception to the public policy bar, holding that insurance policy covered claims against fertility specialist alleged to have fraudulently used his own sperm in artificial insemination of his patients); *Indep. Sch. Dist. No. 697 v. St. Paul Fire & Marine Ins. Co.*, 515 N.W.2d

576, 579–80 (Minn.1994) (policy contained no intentional-acts exclusion; court rejected argument that public policy barred recovery and held that policy covered intentional age discrimination claim under "wrongful act" provision in policy); *Vigilant Ins. Co. v. Kambly*, 114 Mich.App. 683, 319 N.W.2d 382, 384–85 (1982) (policy contained no intentional-acts exclusion; court rejected argument that public policy barred recovery and recognized exception to the public policy bar, holding that public policy principles did not preclude coverage under a professional liability policy for a psychiatrist's intentional sexual abuse of a patient).

In rejecting the public policy argument, the court in *Jacobson* noted that there was no evidence that (1) the insured was induced to inseminate his patients with his own semen because of the availability of insurance coverage, (2) permitting coverage would encourage other medical professionals to engage in similar conduct, or (3) the insured obtained the policy in contemplation of his misconduct. *Jacobson*, 826 F.Supp. at 164. Therefore, the case did not "raise the policy concerns at the heart of the public policy exclusion for intentional wrongdoing." *Id.* In addition, the court reasoned that

> countervailing considerations, i.e., compensating [the insureds'] innocent victims, decidedly outweigh the concern that [the insureds] will unjustly benefit from the extension of coverage. Admittedly, [the insureds] will clearly benefit from coverage under the policy because they will, to the extent of the policy limits, be insulated from personal civil liability. Equally clear, however, is that the primary beneficiaries of this coverage will be innocent third parties, namely the female patients whom Jacobson fraudulently inseminated and their families. The strong policy interest in compensating these innocent victims tips

the scales in this case in favor of coverage. And this result is not manifestly unfair to the insurer because ... [the insurer] was in a position to include in the policy a specific exclusion in the insurance contract for intentional misconduct. It failed to do so. Therefore, given the absence of specific exclusionary language, and given the absence of compelling policy reasons to bar coverage, public policy does not operate here to preclude coverage.

*Id.* at 164–65 (footnote omitted); *accord Kambly*, 319 N.W.2d at 385.

Even before *Jacobson* and *Kambly*, courts recognized exceptions to the general rule barring coverage on public policy grounds based on factors like those in *Jacobson* and *Kambly*. *See, e.g., Ambassador Ins. Co. v. Montes*, 76 N.J. 477, 388 A.2d 603, 605–06 (N.J.1978) (holding that coverage for insured's arson of own property did not violate public policy where wrongdoer did not benefit and third person received protection afforded by insurance); *Dent v. Virginia Mut. Benefit Life Ins. Co.*, 226 A.2d 166, 167–68 (D.C.1967) (holding that allowing recovery of life insurance proceeds by innocent beneficiary where insured's criminal conduct led to his death did not violate public policy).

Courts in Florida, Pennsylvania, and Oregon engage in a specific analysis to determine whether coverage of a particular act is against public policy where the policy has no intentional-acts exclusion. In Florida, the court in *Ranger Insurance Co. v. Bal Harbour Club, Inc.* looked to two factors: "the conduct of the insured (is it a type that will be encouraged by insurance?), and the purpose served by the imposition of liability for that conduct (is it to deter wrongdoers or compensate victims?)." 549 So.2d 1005, 1007 (Fla.1989). Thus, if the type of conduct is such as to

be encouraged by insurance and the primary purpose of imposing liability is to deter wrongdoers rather than to compensate victims, public policy would bar recovery. *Id.* at 1007–08.

The United States District Court in Pennsylvania considered the following factors in determining whether public policy precluded coverage for intentional acts where the policy contained no intentional-acts exclusion:

> 1. whether gain was derived from an illegal act or the insured suffered a loss by being legally required to compensate an injured third party;
>
> 2. whether permitting coverage would encourage others to engage in intentional unlawful activity for the purpose of reaping a benefit; and
>
> 3. whether permitting recovery would permit the insured to escape the consequences flowing from criminal or intentional and malicious conduct.

*USX Corp. v. Adriatic Ins. Co.,* 99 F.Supp.2d 593, 631 (W.D.Pa.2000). The Oregon court analyzed the issue as follows:

> A contract to indemnify the insured for damages he is forced to pay as a result of an intentionally inflicted injury upon another should not be regarded as contrary to public policy unless the fact of insurance coverage can be related in some substantial way to the commission of wrongful acts of that character.... [P]unishment rather than deterrence is the real basis upon which coverage should be excluded. A person should suffer the financial consequences flowing from his intentional conduct and should not be reimbursed for his loss, even though he bargains for it in the form of a contract of insurance. A similar idea is expressed in the cases which exclude coverage on the ground that "a person should not profit from his own wrong."

*Isenhart v. General Cas. Co. of Am.,* 233 Or. 49, 377 P.2d 26, 28 (1962) (citation omitted).

**2. The merits.** As mentioned, the excess policy here affords broad coverage and has no intentional-acts-exclusion provision. The precise issue then is whether in these circumstances public policy bars coverage of a loss due to intentional fraud—an issue of first impression for us.

We begin our analysis with a caveat: "The power to invalidate a contract on public policy grounds must be used cautiously and exercised only in cases free from doubt." *DeVetter v. Principal Mut. Life Ins. Co.,* 516 N.W.2d 792, 794 (Iowa 1994). To strike down a contract on public policy grounds, we must conclude that "the preservation of the general public welfare ... outweigh[s] the weighty societal interest in the freedom of contract." *Id.* We have recognized that "[t]here is a certain danger in too freely invalidating private contracts on the basis of public policy.... '[F]or a court to undertake to invalidate private contracts upon the ground of "public policy" is to mount "a very unruly horse, and when you once get astride it, you never know where it will carry you."'" *Skyline Harvestore Sys., Inc. v. Centennial Ins. Co.,* 331 N.W.2d 106, 109 (Iowa 1983) (citation omitted).

In *Skyline Harvestore,* we addressed an issue similar to the one before us: whether public policy bars recovery of punitive damages under a liability insurance policy that did not expressly exclude such damages from coverage. 331 N.W.2d at 108. The insurer argued that insurance coverage of punitive damages would contravene the public policy purposes underlying punitive damages: punishment and deterrence. *Id.* at 108–09. While not repudiating those purposes, we concluded that public policy

reasons for punitive damages cannot override other considerations favoring coverage of punitive damages under the insurance policy in question. *Id.* In reaching that conclusion, we said:

> We realize that the result of our decision is to elevate the public policy of freedom to contract for insurance coverage above the public policy purposes of punitive damages. We do so for two reasons. First, we doubt that ordinary potential tortfeasors make calculations to determine if the expected benefits of a harmful act are outweighed by the potential costs of punitive damages, insured or uninsured. Second, we do not view our decision as totally abrogating the sting of punitive damages. The sting will continue to be felt by the uninsured, the underinsured, and the poor risks who will experience substantial difficulty and high costs in obtaining such insurance.

*Id.* at 109.

We think that the public policy of freedom of contract for insurance coverage should again prevail. But in this instance, it should prevail over the public policy reasons for barring coverage for the intentional act of fraud. In reaching that conclusion, we apply the framework of analysis in *Jacobson* and *Kambly*, which fits this case.

As in *Jacobson* and *Kambly*, the case here does not present the policy considerations generally cited in support of the public policy coverage bar. There is no evidence that the availability of insurance coverage induced Jungling to defraud the Steckels or that such coverage will encourage others to engage in similar conduct in the future. As a practical matter, we seriously doubt that prospective insureds contemplate purchasing broad coverage insurance with the thought of defrauding someone in the future. And for sure, there is no evidence that Jungling purchased the policy contemplating that he would defraud the Steckels.

The countervailing considerations mentioned in *Jacobson* and *Kambly* are likewise present here. Compensating Jungling's innocent victims—the Steckels—outweighs the concern that Jungling will unjustly benefit from coverage. It is true that Jungling will benefit to the extent he is reimbursed for what he is out, which, as we discuss later, will be considerably less than the demand amount. But the ultimate and primary beneficiaries of the coverage will be innocent third parties—the Steckels. And as far as Grinnell is concerned, it was in a far better position than anyone to protect itself by including an intentional-acts-exclusion provision in the excess policy. We therefore conclude public policy does not operate here to preclude coverage.

## VI.   The Notice Issue.

The notice provision in the excess policy was included in the "Conditions" section under the subpart captioned "Your Duties After a Loss":

> If legal proceedings are brought against the insured person, the insured person must immediately notify us in writing and forward to the underlying insurer and to us every demand, summons or other process received by the insured person.

The policy further stated in the "Conditions" section under the subpart captioned "Suit Against Us":

> No legal action can be brought against us until:
>
> (a) The insured person has complied with all policy terms.

When, as here, a notice provision is written as a condition precedent to policy coverage, the insured must show

substantial compliance with the condition. *Met–Coil Sys. Corp. v. Columbia Cas. Co.*, 524 N.W.2d 650, 654 (Iowa 1994). The notice provision is one of the basic and essential provisions of the contract and is of the essence of the agreement. *Id.* at 655. The substantial compliance requirement is necessary because the notice provision is "the only avenue by which unjust claims can be successfully denied or defended. Unless given notice within a reasonable time, evidence could be lost and key witnesses never discovered." *Henderson v. Hawkeye–Security Ins. Co.*, 252 Iowa 97, 107, 106 N.W.2d 86, 92 (1960). Where, as here, the notice provision requires notice to be provided *directly* to the insurer, notice to an agent does not constitute substantial compliance. *Met–Coil*, 524 N.W.2d at 656.

If the insured cannot show substantial compliance, the insured, to maintain an action against the insurer, must show that the failure to comply was excused, or that the requirements of the condition were waived, or that failure to comply was not prejudicial to the insurer. *Henderson*, 252 Iowa at 107, 106 N.W.2d at 92. Ordinarily, the question of whether the insured has reasonably given notice of suit to the insurer is one of fact for the factfinder. *Fireman's Fund Ins. Co. v. ACC Chem. Co.*, 538 N.W.2d 259, 262 (Iowa 1995).

Unless the insured shows such substantial compliance, excuse, waiver, or lack of prejudice to the insurer, prejudice must be presumed. *Henderson*, 252 Iowa at 107, 106 N.W.2d at 92. The presumption is rebuttable, but unless the presumption is overcome by a satisfactory showing of lack of prejudice, the presumption will defeat the insured's recovery. *Met–Coil*, 524 N.W.2d at 658.

An insured's mistaken belief or lack of knowledge regarding coverage may be a justifiable excuse for noncompliance with an insurance policy's notice provision. *Id.* at 657. Such a justifiable excuse exists only if the insured exercised due diligence. *Id.* To satisfy the due diligence requirement, the insured must have not been negligent and must have at least made a reasonable effort to discover the existence of coverage. *Id.*

Here, the district court concluded that Jungling did not prove substantial compliance because the evidence was undisputed that he forwarded the suit papers to Ervin Mellema, an authorized agent of Grinnell, rather than directly to Grinnell as the excess policy required. However, the court did conclude that Jungling showed that his failure to comply with the notice provision was legally excused. In reaching that conclusion, the court made the following findings, which the court noted were undisputed. Jungling promptly informed Mellema of the lawsuit and provided him with a copy of the Steckels' petition. Thereafter, Mellema telephoned a Grinnell claims manager. After that conversation, Mellema told Jungling that he—Mellema—had been advised by Grinnell there was no coverage. Jungling relied upon Mellema's statement that Grinnell had denied coverage. Jungling was not negligent and made a reasonable effort to discover the existence of coverage. Substantial evidence supports these findings. Based on these findings the district court correctly concluded that Jungling's failure to comply with the notice provision was legally excused. *See St. Paul Fire & Marine Ins. Co. v. Elliott*, 545 So.2d 760, 763 (Ala.1989) (holding that failure to comply with notice provision in policy of insurance was excused because of agent's advice to insured, based on notice from insurer, that there was no coverage).

## VII. The Indemnification Issue.

In March 1998, the Steckels executed a release covering all claims and causes of action arising out of the fraudulent sale of the farm. The document released "Henry C. Jungling, Jr., Becky Jungling, and Jungling Farms, Inc." Jungling Farms, Inc. paid the Steckels the amount of the settlement, $465,000. Jungling Farms, Inc. obtained the money from Jungling. The settlement was concluded and the money paid before the district court entered its judgment in this case. In view of these facts, Grinnell contends the district court erred to the extent the court required it to pay more than one-half of the demand amount, or $172,200.

Concluding that Grinnell was obligated to indemnify Jungling for the full amount of the demand, the district court reasoned as follows:

The Court further concludes that Jungling is entitled to a declaratory judgment that [Grinnell] is obligated to indemnify him for the losses sustained in connection with the Steckel litigation. [Grinnell's] argument that it should be excused from reimbursing Jungling for his loss based on the technicality as to the manner in which the settlement was paid is without merit. Jungling and Jungling Farms, Inc. were jointly and severally liable on the judgment and the Steckels could have sought satisfaction from either party.... While Jungling Farms, Inc. issued the settlement check, Jungling personally incurred the loss as he was the sole source of the settlement funds. He was obligated to pay the settlement because he was the only party financially capable of doing so. [Grinnell] consented to the settlement. Jungling's payment of the settlement funds constitutes a loss compensable under the personal excess policy even though the funds were routed through Jungling

Farms, Inc. The personal excess policy covers "loss" occurring during the policy period. "Loss" is defined as "the amount the insured ... is legally obligated to pay due to judicial decision or compromise without written consent." Jungling personally was legally obligated to pay the entire judgment under the doctrine of joint and several liability. Accordingly, his payment of the settlement constitutes a loss compensable under the personal excess policy even though the funds were routed through Jungling Farms, Inc.

For reasons that follow, we disagree with this reasoning and legal conclusion. Jungling paid the funds into Jungling Farms, Inc. on the advice of his accountant to obtain a tax benefit. As Grinnell points out, on the one hand Jungling represented to tax authorities that the settlement was paid by Jungling Farms, Inc. On the other hand, Jungling asserted in this proceeding that he personally paid the settlement. We agree with Grinnell that he cannot have it both ways. When Jungling paid the funds into Jungling Farms, Inc., the funds became the property of the corporation. Therefore, Jungling Farms, Inc. suffered the loss when it paid the settlement, not Jungling. There was no coverage as far as Jungling Farms, Inc. was concerned. Grinnell was therefore not obligated to indemnify Jungling Farms, Inc. for *any* loss it incurred.

The district court erred in relying on the joint and several liability rule when it concluded that Grinnell was obligated to indemnify Jungling for the full amount of the demand. It is true that according to the joint and several liability rule, each defendant was liable for the total amount of the judgment. *Slager v. HWA Corp.*, 435 N.W.2d 349, 351 (Iowa 1989) (common-law rule of joint and several liability permits recovery of the total judgment

against any one defendant). The joint and several liability rule is a tort principle inuring to the benefit of the plaintiff. The rule has nothing to do with Grinnell's obligation under the policy to pay *only* for a loss sustained by an insured. Nevertheless, because Grinnell is only asking to have its liability limited to fifty percent of the demand, we have no alternative but to abide by that request. *Cf. State ex rel. Miller v. Midwest Pork, L.C.*, 625 N.W.2d 694, 701 (Iowa 2001) ("Although the statute as we have interpreted it would permit broader injunctive relief, the district court, in fashioning its order, should restrict the injunction to that requested by the State."); *Douglass v. Iowa City*, 218 N.W.2d 908, 914 (Iowa 1974).

## VIII. Disposition.

In sum, the district court correctly concluded that (1) the policy language provided coverage, (2) public policy did not bar coverage, and (3) Jungling's noncompliance with the notice provision of the policy was legally excused. The court, however, erred in concluding that Grinnell was obligated under the policy to reimburse Jungling for the demand it made to Grinnell, that is $344,400. However, because Grinnell only asks that its liability be limited to fifty percent of the demand, we reverse and remand for an entry of judgment that Grinnell is obligated to reimburse Jungling for $172,200. We affirm the district court's judgment in all other respects.

**COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED WITH DIRECTIONS.**